**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

LARON DARRELL CARTER,
AKA Birdd, AKA Gardena
Pimpin Birdd, AKA Garr
Birdd, AKA Pi Birdd, AKA Pi
Pimpin Birdd,
*Defendant-Appellant*.

No. 16-50271

D.C. No.
2:14-cr-00297-VAP-1

OPINION

Appeal from the United States District Court
for the Central District of California
Virginia A. Phillips, Chief Judge, Presiding

Argued and Submitted August 27, 2018
Pasadena, California

Filed November 2, 2018

Before: Ronald M. Gould and Jay S. Bybee, Circuit
Judges, and Marco A. Hernandez,[*] District Judge.

Opinion by Judge Bybee

---

   [*] The Honorable Marco A. Hernandez, United States District Judge
for the District of Oregon, sitting by designation.

## SUMMARY[**]

### Criminal Law

The panel vacated the defendant's convictions on one count of violating 18 U.S.C. § 1591 (sex trafficking of a minor or by force, fraud, or coercion) and one count of violating 18 U.S.C. § 2423(a) (transportation of a minor in interstate commerce to engage in prostitution), and remanded for resentencing on remaining counts as to which the panel affirmed the defendant's convictions in a concurrently-filed memorandum disposition.

The panel held that a defendant's right to physically confront an adverse witness (whether child or adult) cannot be compromised by permitting the witness to testify by video (whether one-way or two-way) unless use of the remote video procedure is necessary and the reliability of the testimony is otherwise assured. Because alternatives were available for obtaining a victim-witness's testimony that would have preserved the defendant's right to physical confrontation, the use of a remote video was not necessary in this case, and violated the defendant's Sixth Amendment right to confront the witnesses against him.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Benjamin L. Coleman (argued), Coleman & Balogh LLP, San Diego, California, for Defendant-Appellant.

Jeffrey Chemerinsky (argued) and Jeff Mitchell (argued), Assistant United States Attorneys, Violent & Organized Crime Section; Lawrence S. Middleton, Chief, Criminal Division; Nicola T. Hanna, United States Attorney; United States Attorney's Office, Los Angeles, California; for Plaintiff-Appellee.

**OPINION**

BYBEE, Circuit Judge:

Laron Carter was tried and convicted on seven counts of violating 18 U.S.C. § 1591, and seven counts of violating 18 U.S.C. § 2423(a), based on his trafficking and prostitution of seven minor girls. During Carter's trial, one of the victims, J.C., testified against him from Minnesota by two-way video, as she was seven months pregnant and unable to travel. Carter contends that permitting J.C. to testify against him remotely by two-way video, rather than in person, violated his Sixth Amendment right to confront the witnesses against him.

We agree. Criminal defendants have a right to "physical, face-to-face confrontation at trial," and that right cannot be compromised by the use of a remote video procedure unless it is "necessary" to do so and "the reliability of the testimony is otherwise assured." *Maryland v. Craig*, 497 U.S. 836, 850 (1990). Because alternatives were available for obtaining

J.C.'s testimony that would have preserved Carter's right to physical confrontation, the use of a remote video procedure was not necessary in this case. We therefore vacate Carter's convictions on the two counts involving J.C. and remand to the district court for resentencing on the remaining counts.[1]

I

Carter was convicted of forcing seven minor girls into prostitution and trafficking them across state lines. The crimes took place over a ten-year period from 2003 to 2013. For each of the seven victims, Carter was charged with one count of violating 18 U.S.C. § 1591 (sex trafficking of a minor or by force, fraud, or coercion), and one count of violating 18 U.S.C. § 2423(a) (transportation of a minor in interstate commerce to engage in prostitution), for a total of fourteen counts.

One week before Carter's April 2016 trial, the government filed an *ex parte* application regarding the anticipated testimony of J.C., the victim for Counts 13 and 14. J.C., who was by then an adult living in Minnesota, was seven months pregnant with a due date in June. The government explained that J.C. had been hospitalized for complications with her pregnancy and that her doctor had instructed her not to travel from Minnesota to California. Accordingly, the government sought either to take J.C.'s deposition in Minnesota pursuant to Federal Rule of Criminal Procedure 15, or to have her testify during trial from Minnesota via live two-way video conference. With respect to the out-of-court deposition, the government proposed that

---

[1] In a concurrently-filed memorandum disposition, we affirm Carter's convictions on the remaining counts.

the parties would fly to Minnesota in the middle of trial and suggested that it would try to secure, but could not guarantee, Carter's physical attendance.

Carter opposed both options on Confrontation Clause grounds. He objected to the deposition because the logistics for securing his attendance at the deposition could not be arranged on such short notice, and because counsel would have to forgo preparation for trial to attend the deposition. He objected to the live two-way video procedure based on his "constitutional rights to personally confront his accuser at trial." He concluded by noting that, if he were forced to select one of the two alternatives, he would choose the two-way video procedure. The district court granted the government's application to use two-way video, and the case proceeded to trial.

On the second day of trial, Carter again objected to the two-way video procedure. He argued that under *Craig*, permitting J.C. to testify by two-way video would violate his right to confrontation unless the court found that J.C.'s absence was "necessary to further an important public policy." The district court overruled Carter's objection. Despite the government's failure to provide any "direct evidence from [J.C.'s] physician," the court concluded that J.C. was "unavailable" because "she had been advised by her doctor not to travel, given the advanced state of her pregnancy." The court also concluded that J.C.'s "testimony [was] necessary" to the government's case, and that the two-way video procedure would "satisfy all the requirements of the Confrontation Clause"—J.C. would testify under oath, she would be subject to cross-examination, and the jury would be able to observe her demeanor.

J.C. testified by two-way video at trial. At the start of her testimony, the court instructed the jurors that, although J.C. was testifying "via live video feed," they were "to treat the testimony the same as a witness who is physically present in the courtroom." J.C. was then sworn in by the courtroom deputy and asked to identify Carter while the camera scanned the courtroom. She responded: "Um, is that him right there next to – I can't really see that well on you guy's thing, but I believe that's him next to these two gentlemen right there. I can't really see that well." After she described Carter's clothing, the court "note[d] that the witness has identified the defendant."

J.C. proceeded to testify about her relationship with Carter. She stated that she met Carter in 2013, when she was 16 years old. She was living in Minnesota at the time, and Carter bought her a bus ticket to Los Angeles under an alias because she was underage. When she arrived in Los Angeles, Carter picked her up and took her to a motel room. There, he photographed her in lingerie and used the photographs in an advertisement on Backpage, a website used to advertise sexual services. She then worked as a prostitute for Carter for approximately two weeks. She testified that Carter kept all of her earnings, dictated how much she should charge and what she should wear, and threatened to beat her if she did not comply.

In addition to J.C.'s testimony, the government introduced as evidence her birth certificate, which confirmed that she was 16 years old when the conduct took place, as well as a record of the bus ticket J.C. used to get to Los Angeles, which confirmed that Carter purchased it. The government also introduced the Backpage advertisement, evidence showing that the credit card used to pay for this advertisement was the

same credit card used to pay for an advertisement of another prostitute who worked for Carter, and evidence showing that the Internet Protocol ("IP") address used to access Carter's Facebook account matched the IP address used to create the Backpage advertisement. That IP address was traced to a Travelodge motel, the decor of which matched the background in the Backpage advertisements featuring J.C.

Aside from J.C., five of the other victims testified in person at trial, and one of the victims did not testify at all. Carter was ultimately convicted on all fourteen counts and sentenced to 40 years' imprisonment. Because the group of counts involving J.C. (Counts 13 and 14) carried the highest offense level under the United States Sentencing Guidelines ("U.S.S.G."), those counts served as the base for calculating his final sentencing range. *See* U.S.S.G. §§ 3D1.2, 3D1.4.

## II

Carter argues that permitting J.C. to testify by two-way video violated his rights under the Sixth Amendment's Confrontation Clause. "We review claims of a violation of the Confrontation Clause de novo." *United States v. Nguyen*, 565 F.3d 668, 673 (9th Cir. 2009).[2]

---

[2] The government argues that this claim should be reviewed under the plain error standard because Carter did not "request[] either a continuance or severance" of Counts 13 and 14 in the district court. The argument has no merit. Both before and during trial, Carter specifically objected to the use of two-way video testimony on Confrontation Clause grounds. These objections, which brought Carter's "Confrontation Clause claim to the attention of both the district court and the government," were sufficient "to avoid the plain error standard" on appeal. *Nguyen*, 565 F.3d at 673 n.2. Carter was not obligated to suggest other strategies for how the government could introduce evidence against him.

A

The Confrontation Clause of the Sixth Amendment guarantees a criminal defendant the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. "[T]he Confrontation Clause provides two types of protections for a criminal defendant: the right physically to face those who testify against him, and the right to conduct cross-examination." *Coy v. Iowa*, 487 U.S. 1012, 1017 (1988) (quoting *Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987) (plurality opinion)). As the Supreme Court observed in *Coy*, most Confrontation Clause cases concern the second of these protections and its implications for using out-of-court statements by witnesses who do not testify at trial. *Id.* at 1016. That remains true today. *See, e.g.*, *Ohio v. Clark*, 135 S. Ct. 2173 (2015); *Michigan v. Bryant*, 562 U.S. 344 (2011); *Giles v. California*, 554 U.S. 353 (2008); *Crawford v. Washington*, 541 U.S. 36 (2004). But at its core, "the Confrontation Clause guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact." *Coy*, 487 U.S. at 1016; *see California v. Green*, 399 U.S. 149, 157 (1970) (explaining that the "literal right to 'confront' the witness at the time of trial . . . forms the core of the values furthered by the Confrontation Clause").

The Supreme Court has twice addressed the right to face-to-face confrontation. In *Coy*, the Court held that the placement of a screen between the defendant and two child witnesses, which allowed the "witnesses to avoid viewing [the defendant] as they gave their testimony," constituted an "obvious . . . violation of the defendant's right to a face-to-face encounter." 487 U.S. at 1020. In reaching that conclusion, the Court illustrated "the profound effect upon a witness of standing in the presence of the person the witness

accuses," explaining that a physically-confronted "witness 'may feel quite differently when he has to repeat his story looking at the man whom he will harm greatly by distorting or mistaking the facts.'" *Id.* at 1019–20 (quoting Zechariah Chafee, *The Blessings of Liberty* 35 (1956)). The "right to face-to-face confrontation" thus serves to "ensure the integrity of the fact-finding process." *Id.* (citation and internal alteration omitted). Accordingly, the Court held that the Confrontation Clause's "irreducible literal meaning" guarantees "a right to meet face to face all those who appear and give evidence at trial." *Id.* at 1021 (emphasis omitted) (quoting *Green*, 399 U.S. at 175 (Harlan, J., concurring)). Nevertheless, the Court acknowledged that "face-to-face presence may, unfortunately, upset the truthful rape victim or abused child; but by the same token it may confound and undo the false accuser, or reveal the child coached by a malevolent adult. It is a truism that constitutional protections have costs." *Id.* at 1020. The Court "le[ft] for another day" the question whether there were exceptions to the right to face-to-face confrontation, observing that any exception "would surely be allowed only when necessary to further an important public policy." *Id.* at 1021.

That day came two years later in *Craig*. There, the Court upheld a Maryland statute permitting child victims of abuse to testify from outside the courtroom by one-way closed circuit television. 497 U.S. at 840–41, 860. This procedure could be invoked only if the trial judge found "that testimony by the child victim in the courtroom will result in the child suffering serious emotional distress such that the child cannot reasonably communicate." *Id.* at 840–41 (citation omitted). The prosecutor and defense counsel could examine and cross-examine the child witness in a separate room. *Id.* at 841. The defendant and jury could see the testifying child witness on

a monitor in the courtroom, but the witness could not see the defendant.  *Id.* at 841–42.

The Court declared that, while "the Confrontation Clause reflects a *preference* for face-to-face confrontation," defendants do not have an "*absolute* right to a face-to-face meeting with witnesses against them at trial."  *Id.* at 844, 849 (quoting *Ohio v. Roberts*, 448 U.S. 56, 63 (1980)).  But the Court cautioned that "the face-to-face confrontation requirement" should not "easily be dispensed with."  *Id.* at 850.  Thus, the Court held that "a defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial only where" (1) the "denial of such confrontation is necessary to further an important public policy," and (2) "the reliability of the testimony is otherwise assured."  *Id.* at 850.

Armed with this two-part test, the Court turned to Maryland's video procedure.  The Court first concluded that the procedure adequately ensured the "reliability and adversariness" of the testimony, as it "preserve[d] all of the other elements of the confrontation right"—the child witness had to be competent to testify under oath, the defendant could conduct live cross-examination, and everyone in the courtroom could observe the witness's demeanor.  *Id.* at 851.  The Court further concluded that "a State's interest in the physical and psychological well-being of child abuse victims may be sufficiently important to outweigh, at least in some cases, a defendant's right to face his or her accusers in court."  *Id.* at 853.  But such cases would require a "case-specific finding" that the procedure is "necessary to protect a child witness from trauma that would be caused by testifying in the physical presence of the defendant" when "such trauma would impair the child's ability to communicate."  *Id.* at

857–58. The Court explained that the trial court would need to find that the witness would be traumatized by the defendant's presence in the courtroom, not from the courtroom generally, and that the trauma would rise to a level that is "more than *de minimis*." *Id.* at 856.

B

*Craig* involved one-way video testimony by a child witness, while this case involves two-way video testimony by an adult witness. The Supreme Court has not decided whether *Craig*'s standard applies in these circumstances,[3] and until now we have applied *Craig* only in the context of 18 U.S.C. § 3509, a statute enacted in direct response to *Craig* that permits child witnesses to testify by two-way video. *See United States v. Etimani*, 328 F.3d 493, 499 (9th Cir. 2003); *United States v. Quintero*, 21 F.3d 885, 892 (9th Cir. 1994); *United States v. Garcia*, 7 F.3d 885, 888–89 (9th Cir. 1993). We now make clear that a defendant's right to physically confront an adverse witness (whether child or adult) cannot be compromised by permitting the witness to testify by video (whether one-way or two-way) unless

---

[3] The vitality of *Craig* itself is questionable in light of the Supreme Court's later decision in *Crawford*, which abrogated *Roberts*, a case relied upon heavily in *Craig* that permitted "open-ended exceptions from the confrontation requirement" based on "judicial determination[s] of reliability." *Crawford*, 541 U.S. at 54, 62 (abrogating *Roberts*, 448 U.S. 56); *see Craig*, 497 U.S. at 847–52. But while *Craig* and *Crawford* stand in "marked contrast" in several respects, "*Crawford* did not overturn *Craig*." *United States v. Cox*, 871 F.3d 479, 492–95 (6th Cir. 2017) (Sutton, J., concurring), *cert. denied*, 138 S. Ct. 754 (2018). We thus remain bound by *Craig* until the Supreme Court "see[s] fit to reconsider [it], regardless of whether subsequent cases have raised doubts about [its] continuing vitality." *Bosse v. Oklahoma*, 137 S. Ct. 1, 2 (2016) (per curiam) (citation omitted).

*Craig*'s standard is satisfied. And that standard is a stringent one; the use of a remote video procedure must be reserved for rare cases in which it is "necessary." *Craig*, 497 U.S. at 850.

Our conclusion follows directly from the "core" of the Confrontation Clause guarantee—providing the accused an "opportunity to challenge his accuser in a face-to-face encounter in front of the trier of fact." *Green*, 399 U.S. at 156–57. Not only does physical confrontation at trial serve as a symbol of fairness, but it also promotes reliability, for "[i]t is always more difficult to tell a lie about a person 'to his face' than 'behind his back.'" *Coy*, 487 U.S. at 1019. Compelling "adverse witnesses at trial to testify in the accused's presence" thus "enhances the accuracy of factfinding" at trial. *Craig*, 497 U.S. at 846–47. So too does "compelling [witnesses] to stand face to face with the jury" as they tell their side of the story. *Green*, 399 U.S. at 158 (quoting *Mattox v. United States*, 156 U.S. 237, 242 (1895)). These important components of confrontation are lost when the witness is not testifying in court, regardless of the witness's age or ability to see the defendant on a screen from a distant location. Any procedure that allows an adverse witness to testify remotely necessarily diminishes "the profound [truth-inducing] effect upon a witness of *standing in the presence* of the person the witness accuses." *Coy*, 487 U.S. at 1020 (emphasis added).

There are also important practical differences between face-to-face confrontation and virtual confrontation. From the remote witness's point of view, the courtroom will necessarily be defined by the angle and quality of the courtroom camera as well as the size and quality of the screen on which the video is projected. These variables can distort any effort to approximate in-person testimony. The record in

this case bears this out. When asked to identify Carter in the courtroom, J.C. hesitantly did so after testifying that she "c[ould]n't really see that well." Moreover, unless the defendant has multiple attorneys, such that one could travel to the witness's remote location while the other remains in the courtroom, the defendant would be unable to ensure that, for example, "the witness is not being coached or influenced during testimony, and that the witness is not improperly referring to documents." *United States v. Hamilton*, 107 F.3d 499, 503 (7th Cir. 1997). There is no suggestion of such misconduct in this case; we point this out only to show that physical confrontation serves purposes other than permitting cross-examination and allowing the jury to see the witness's face.

It also bears noting that no procedural mechanism exists for employing a video procedure in the manner it was employed here. Federal Rule of Criminal Procedure 26 requires that, absent certain circumstances, "[i]n every trial the testimony of witnesses must be taken in open court." The Judicial Conference once suggested a revision to Rule 26 that would have allowed testimony by two-way video in special circumstances, but the Supreme Court declined to transmit the proposed revision to Congress. *Order of the Supreme Court*, 207 F.R.D. 89, 91–92 (2002). Justice Scalia filed a statement explaining that he "share[d] the majority's view" that the proposal was "of dubious validity under the Confrontation Clause," as it failed to "limit the use of testimony via video transmission to instances where there has been a 'case-specific finding' that it is 'necessary to further an important public policy.'" *Id.* at 93 (statement of Scalia, J.) (citing *Craig*, 497 U.S. at 850, 857–58). Although Justice Scalia's statement is not controlling, his reasoning supports our conclusion that *Craig* supplies the governing standard

when the defendant is deprived of "a physical, face-to-face confrontation at trial," 497 U.S. at 850.

Further support for our view comes from other circuits addressing this issue, which have held that *Craig*'s two-part test applies to the use of two-way video testimony. *See United States v. Yates*, 438 F.3d 1307, 1313–15 (11th Cir. 2006) (en banc); *United States v. Bordeaux*, 400 F.3d 548, 554–55 (8th Cir. 2005); *see also State v. Rogerson*, 855 N.W.2d 495, 502–03 (Iowa 2014) (collecting decisions from several state courts holding that "*Craig* [provides] the standard for assessing the constitutionality of two-way video testimony").[4]  We now join them and expressly hold that a defendant's right to "physical, face-to-face confrontation at trial" may be compromised by the use of a remote video procedure only upon a "case-specific finding" that (1) the denial of physical confrontation "is necessary to further an

---

[4] The Second Circuit has held that "the *Craig* standard" does not apply to two-way video procedures, reasoning that, unlike the one-way video in *Craig*, two-way video "preserve[s] the face-to-face confrontation" required by the Confrontation Clause. *United States v. Gigante*, 166 F.3d 75, 81 (2d Cir. 1999).  Instead of applying *Craig*, the Second Circuit thought the "more profitable comparison" was to Federal Rule of Criminal Procedure 15, which permits the taking of an out-of-court deposition for use in trial in "exceptional circumstances . . . in the interest of justice."  *Id.* (quoting Fed. R. Crim. P. 15(a)).  We agree with the Eighth and Eleventh Circuits that *Gigante* is an outlier and that the proper test is *Craig*.  *See Yates*, 438 F.3d at 1313; *Bordeaux*, 400 F.3d at 555.  Regardless of whether the video procedure is one-way or two-way, the defendant is being denied "a physical, face-to-face confrontation at trial."  *Craig*, 497 U.S. at 850.  And equating a two-way video procedure with face-to-face confrontation necessarily neglects the "intangible elements" of confrontation that, as even the *Gigante* court admits, may be "reduced or even eliminated by remote testimony."  166 F.3d at 81.

important public policy," and (2) "the reliability of the testimony is otherwise assured." *Craig*, 497 U.S. at 850, 857.

C

*Craig*'s requirement of necessity was not met here. Although the district court concluded that J.C. was "unavailable to travel to be physically present" at trial, all agree that J.C.'s inability to travel was due to her pregnancy—a temporary disability. There were alternatives available to preserve Carter's right to physical face-to-face confrontation, meaning that denying him that right was not necessary.

The most obvious alternative would have been to continue the trial in anticipation of J.C.'s recovery. *See United States v. Jacobs*, 97 F.3d 275, 281 (8th Cir. 1996); *Peterson v. United States*, 344 F.2d 419, 425 (5th Cir. 1965). As the government acknowledges in its brief, J.C. was unable to travel "for the duration of her pregnancy (which was two months)." Continuances have been granted in similar circumstances. *See, e.g.*, *United States v. Howard*, 218 F.3d 556, 562–63 (6th Cir. 2000) (affirming a four-month "continuance requested by the government on the ground that [a prosecution witness] had been hospitalized after going into premature labor and was therefore unavailable to testify"). Another alternative would have been to sever the two counts involving J.C. while maintaining the scheduled trial date for the remaining counts. *See, e.g.*, *Garris v. United States*, 418 F.2d 467, 468–70 (D.C. Cir. 1969) (affirming severance of counts at the government's request when "the necessary witnesses" for the various counts "could not be available at the same time"). Although some of the government's evidence may have overlapped among the counts, the charges

were not inseparable. To the contrary, the jury was specifically instructed that the "verdict on one count should not control [the] verdict on any other count." Either of these alternatives would have allowed Carter to confront J.C. face-to-face, without screens, cables, and thousands of miles between them.

We are mindful that having to make these adjustments on the eve of trial is not ideal. But a criminal defendant's constitutional rights cannot be neglected merely to avoid "added expense or inconvenience." *Green*, 399 U.S. at 189 n.22 (Harlan, J., concurring). We also realize that there may be some cases in which it is truly necessary to forgo physical confrontation at trial due to a witness's medical condition. *See, e.g.*, *Horn v. Quarterman*, 508 F.3d 306, 310, 320 (5th Cir. 2007) (finding *Craig*'s "necessity-based exception" satisfied on habeas review when the witness was "terminally ill with cancer and being treated in [another state]"). But in this case, the government did not even attempt to continue the trial, sever the counts, or both before resorting to a procedure that prevented Carter from confronting his accuser in person. "The right of confrontation may not be dispensed with so lightly." *Barber v. Page*, 390 U.S. 719, 725 (1968).

The government did suggest another possible alternative—deposing J.C. in Minnesota.[5] Although live, in-person testimony would be preferable to out-of-court

---

[5] The government proposed taking J.C.'s deposition under Rule 15, and offered two-way video as an alternative. Carter objected to both proposals, expressing doubts that the deposition could be scheduled without interfering with the trial schedule. The district court rejected the proposed deposition without comment and granted the government's application to proceed by video.

testimony, a deposition would have at least preserved Carter's right to physical confrontation. *See* Fed. R. Crim. P. 15(a), (c)(1). Indeed, *Craig* itself notes that the "denial of face-to-face confrontation would be unnecessary" if the witness could testify elsewhere "with the defendant present." 497 U.S. at 856; *see Yates*, 438 F.3d at 1317 (finding no necessity where the defendants and witnesses could "be placed in the same room for the taking of pre-trial deposition testimony pursuant to Rule 15"). And if logistics prevented the government from securing Carter's physical presence at J.C.'s deposition while also maintaining the trial schedule, the court could have granted a brief continuance to allow the deposition to be completed with Carter present.[6]   Given these various alternatives, forgoing physical confrontation in favor of a two-way video procedure was not "necessary." *Craig*, 497 U.S. at 850.

The government tries to overcome this conclusion by pointing to Federal Rule of Evidence 804, which permits the introduction of certain hearsay statements made prior to trial when the declarant is "unavailable" to testify in court because of "a then-existing infirmity, physical illness, or mental illness." Fed. R. Evid. 804(a)(4), (b). As the government correctly observes, we have held that "risks in late pregnancy, when attested to by a physician, are an 'infirmity' within the

---

[6] We express no opinion on whether the government could have satisfied the Confrontation Clause by deposing J.C. without Carter physically present, other than to note that the government is generally required to "secure the defendant's actual, physical presence" at a Rule 15 deposition and that we have excused this requirement only when fulfilling it would be "impossibl[e]." *United States v. Medjuck*, 156 F.3d 916, 920 (9th Cir. 1998) (quoting *Christian v. Rhode*, 41 F.3d 461, 467 n.8 (9th Cir. 1994)); *see* Fed. R. Crim. P. 15(c)(1).

meaning of [Rule 804(a)(4)]." *United States v. McGuire*, 307 F.3d 1192, 1205 (9th Cir. 2002).

This argument suffers from two flaws. First, this case does not involve hearsay statements made prior to trial; J.C. gave live testimony during trial, albeit remotely. As a constitutional matter, the test for admitting out-of-court testimony is "quite separate from" the test adopted in *Craig*, which governs "what *in-court* procedures are constitutionally required to guarantee a defendant's confrontation right once a witness is testifying." *White v. Illinois*, 502 U.S. 346, 358 (1992). If anything, our decision in *McGuire* only sharpens the point, as the hearsay testimony introduced in that case was videotaped testimony from the defendant's first trial. 307 F.3d at 1196; *see* Fed. R. Evid. 804(b)(1). The defendant thus had the opportunity to physically confront the witness at the time the testimony was given. Carter, by contrast, never had that opportunity with respect to J.C.

Second, Rule 804 is a rule of evidence, and the Confrontation Clause's protections do not turn on "the vagaries of the rules of evidence." *Crawford*, 541 U.S. at 61; *see Idaho v. Wright*, 497 U.S. 805, 814 (1990) ("[W]e have . . . been careful not to equate the Confrontation Clause's prohibitions with the general rule prohibiting the admission of hearsay statements."). Indeed, the right to confrontation is a rule of procedure, not evidence. *See Crawford*, 541 U.S. at 60–61. When testimony is being introduced against a defendant in a criminal case, the Confrontation Clause's guarantees do not simply "evaporate when [the] testimony happens to fall within some broad, modern hearsay exception, even if that exception might be justifiable in other circumstances." *Id.* at 56 n.7. We therefore find the government's reliance on Rule 804 unpersuasive.

The government also points out that the two-way video procedure in this case preserved "all other elements of the confrontation right," *Craig*, 497 U.S. at 851, as J.C. was required to be competent, to testify under oath, to undergo contemporaneous cross-examination, and to be viewable by the judge, jury, and defendant. But that is not sufficient. Dispensing with physical confrontation must be "necessary." *Id.* at 850. And a finding that J.C. was temporarily unable to come to court is not the sort of "requisite finding of necessity" that justifies depriving Carter of his constitutional right to physical, face-to-face confrontation. *Id.* at 855.

D

Having found a Confrontation Clause violation, Carter's convictions on Counts 13 and 14 cannot stand unless "the error was harmless beyond a reasonable doubt." *United States v. Larson*, 495 F.3d 1094, 1107 (9th Cir. 2007) (en banc). "The government bears the burden of proving that the error was harmless beyond a reasonable doubt, and we assess this issue by considering 'the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, and, of course, the overall strength of the prosecution's case.'" *United States v. Esparza*, 791 F.3d 1067, 1074 (9th Cir. 2015) (internal alteration omitted) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)). The "assessment of harmlessness cannot include consideration of whether the witness' testimony would have been unchanged, or the jury's assessment unaltered, had there been confrontation"; rather, harmlessness must "be determined on the basis of the remaining evidence." *Coy*, 487 U.S. at 1021–22; *see Nguyen*, 565 F.3d at 675.

The government has not carried its burden of showing that the Confrontation Clause violation was harmless beyond a reasonable doubt.  J.C. was not merely a witness, but the alleged victim of Carter's crimes, and she was the most recent of Carter's alleged victims.  Her testimony was clearly critical evidence with respect to Counts 13 and 14.  The government acknowledged as much in the district court, arguing that "J.C.'s testimony [was] especially central to the government's case."  The remaining evidence for those counts consisted of "documentary evidence" indicating that Carter paid for J.C.'s bus ticket to Los Angeles and for a Backpage ad that included a photograph of J.C.  But this evidence does not, standing alone, establish beyond a reasonable doubt that Carter violated 18 U.S.C. §§ 1591 and 2423.  The documents do not establish, for example, Carter's "intent that [J.C.] engage in prostitution."  18 U.S.C. § 2423(a).  Nor do they establish Carter's knowledge that "force, threats of force, fraud, [or] coercion . . . would be used to cause [J.C.] to engage in a commercial sex act."  *Id.* § 1591(a).  Only J.C. could fill in those gaps.  And she testified that she was 16 when Carter first contacted her, that she told him she was 16, and that he purchased a bus ticket because she was underage and could not get on a plane.  J.C. described how Carter put her up in motels, bought her provocative clothes, and forced her onto the streets.  She testified that he coerced her into prostitution and maintained control over her by collecting all of her earnings and by threatening and beating her if she failed to follow his "rules."  Her testimony was thus central to the government's case on Counts 13 and 14, which "strongly supports a finding that the error was not harmless."  *Fowler v. Sacramento Cty. Sheriff's Dep't*, 421 F.3d 1027, 1042 (9th Cir. 2005) (citing *Olden v. Kentucky*, 488 U.S. 227, 232–33 (1988)).

In any event, "[e]ven when the government's case is 'strong,' a Confrontation Clause violation is not harmless where the erroneously admitted evidence could have 'significantly altered the evidentiary picture.'" *Esparza*, 791 F.3d at 1074 (quoting *United States v. Bustamante*, 687 F.3d 1190, 1195 (9th Cir. 2012)). There is no question that J.C.'s testimony significantly altered the evidentiary picture with respect to Counts 13 and 14. The government's essential argument at closing—that J.C. "worked for [Carter] out on the track, having sex with adult men in cheap motels, and giving all the money to [Carter]"—hinged entirely on J.C.'s testimony. The government has not met its burden to show harmlessness beyond a reasonable doubt. Counts 13 and 14 must be vacated.

## III

Because we vacate Carter's convictions on Counts 13 and 14, the sentencing package imposed by the district court has become "unbundled." *United States v. Christensen*, 828 F.3d 763, 821 (9th Cir. 2015) (quoting *United States v. Ruiz-Alvarez*, 211 F.3d 1181, 1184 (9th Cir. 2000)). Indeed, Carter's sentence was based on Counts 13 and 14, the group of counts with the highest offense level. *See* U.S.S.G. §§ 3D1.2, 3D1.4. We therefore follow "our customary practice" of remanding for the district court "to put together a new package reflecting its considered judgment as to the punishment the defendant deserve[s] for the crimes of which he [i]s still convicted." *Christensen*, 828 F.3d at 821 (internal alterations omitted) (quoting *Ruiz-Alvarez*, 211 F.3d at 1184). We decline to address Carter's additional challenges to his sentence, which he may raise to the extent appropriate on remand.

IV

Permitting J.C. to testify against Carter by two-way video violated Carter's Sixth Amendment right to confrontation, and that error was not harmless beyond a reasonable doubt. For these reasons and those given in the accompanying memorandum disposition, we affirm Carter's convictions on Counts 1–12, vacate his convictions on Counts 13 and 14, and remand to the district court for resentencing.

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED.**