*Jerel Lewis Spinks v. State of Maryland*, No. 1935, September Term 2019.  Opinion by Beachley, J.

**CRIMINAL LAW—SIXTH AMENDMENT RIGHT OF CONFRONTATION—VICTIM'S TESTIMONY BY SKYPE**

Trial court did not violate Appellant's Sixth Amendment right of confrontation by allowing the robbery victim to testify via Skype.  The Skype platform allowed Spinks to confront the victim witness in real time, under oath, and via a two-way platform featuring clear video and sound.  Accordingly, the Skype platform preserved all of the important elements of confrontation aside from face-to-face courtroom testimony.  Additionally, the denial of Spinks's right to face-to-face confrontation was permissible because public policy supports the use of such video technology to enable prosecution of violent crimes against a victim whose citizenship and immigration status prevent him from testifying in person.  Finally, the trial court here made adequate, case-specific findings that the use of video technology in this case was necessary because the victim witness reasonably left the United States in response to his mother's medical emergency, and he could not lawfully return to Maryland to testify at trial.

Circuit Court for Montgomery County
Case No. 135441

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1935

September Term, 2019

_____

JEREL LEWIS SPINKS

v.

STATE OF MARYLAND

_____

Nazarian,
Beachley,
Ripken,

JJ.

_____

Opinion by Beachley, J.

_____

Filed: September 29, 2021

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

On the night of February 18, 2019, in the parking lot of the Sligo House Apartments, Oumar Sanoh was robbed at gunpoint. The State charged Jerel Lewis Spinks, appellant, with assisting the gunman during that robbery. At trial, the contested issue was whether Spinks did so, or instead, whether he was merely present while his companion unexpectedly committed the robbery. After hearing Mr. Sanoh's testimony via Skype, viewing surveillance video showing Spinks and the gunman returning to the apartment building with an item taken from the car, and considering Spinks's statement to police, a jury in the Circuit Court for Montgomery County convicted Spinks of armed robbery and conspiracy to commit armed robbery. He was sentenced to twenty years for the robbery and a consecutive ten years for the conspiracy conviction.

In this appeal, the sole question presented by Spinks is whether the trial court violated his Sixth Amendment right to confront his accuser by allowing Sanoh to testify via Skype.[1] Based on our independent constitutional review of the record, we conclude that the trial court did not err and therefore affirm Spinks's convictions.

## BACKGROUND

*The Motion Record*

Because the sole appellate issue is whether the trial court erred in permitting Mr. Sanoh to testify via Skype, we shall provide a detailed summary of the motion record pertinent to that question. At the outset of proceedings on the scheduled trial date, the

---

[1] Skype is a videoconferencing program allowing for real-time audio and video communication using an internet connection. *About Skype*, Skype, https://www.skype.com/en/about (last visited Aug. 6, 2021).

prosecutor requested permission for Sanoh to testify remotely via Skype. She explained that although Sanoh had been served with a subpoena and was scheduled to meet with her before trial, he received a phone call that his mother had been hospitalized for a medical emergency and flew home to Guinea the next day, on August 13, 2019. He could not return to the United States because he did not have a visa. The prosecutor argued that Skype testimony may be admitted over a Sixth Amendment objection, in accordance with standards established by *Maryland v. Craig*, 497 U.S. 836 (1990), and *White v. State*, 223 Md. App. 353 (2015).

The trial judge ruled that he would conduct a preliminary hearing to determine whether the necessary predicate for Skype testimony was satisfied. Mr. Sanoh testified via Skype, outside the presence of the jury. Confirming the prosecutor's proffer regarding his mother's medical emergency and his flight home, Sanoh testified that he is not a U.S. citizen and that his visa expired in 2018. He explained that he would like to return to the United States but could not do so without a new visa.

Defense counsel objected that the State could not "make a showing of necessity" because Sanoh's expired visa "means that really it was just a matter of time before he was leaving anyway[.]" In counsel's view, moreover, the fact that the prosecutor "had not spoken with [Sanoh] despite various attempts" indicated "that he was not cooperative and didn't want to come in to testify." Based on Sanoh's inability to identify the family member who called him, his lack of any documentation regarding his mother's hospitalization and his flight, and inconsistencies in his testimony, defense counsel argued that Sanoh was not credible.

2

The trial court granted the State's motion, explaining its factual findings and legal conclusions in detail, as follows:

The [S]tate has requested leave to produce the testimony of a witness via Skype. The defendant opposes that request. We have had an evidentiary hearing, at which the [putative] witness has appeared via Skype, was asked questions by the State, was asked questions by counsel for the defendant, was asked questions by the court. I find that the witness appeared by Skype. He appeared via a real time video conference program accessible via computer over the internet. That was recognized by the Court of Appeals in . . . [*Att'y Grievance Comm'n of Md. v. Agbaje*], 438 Md. 695. Understanding that was a civil case, I find here it was a real time video conference at which the witness could see everybody in the courtroom. Everybody in the courtroom, including the defendant, could see the witness. I find the witness was alone when he was testifying. I find the witness was first sworn, that the oath was duly administered just as if the witness had been in the courtroom.

The only potential defect in the Skype program is a tiny delay about sound, a couple of milliseconds. Vastly less than Neil Armstrong's delay from when he was communicating from where he was communicating from to Houston. The screen was clear, not pixelated, and, quoting Judge McCormick, "these were as good as wedding photographs." So, with respect to the quality of the technical piece, I am persuaded that reasonable safeguards are in place to protect the integrity of testimony given through Skype. . . . While I didn't . . . measure that screen diagonally, . . . it's at least 42 inches. I'm sure it's bigger than that, because it looks bigger than my TV. I could see it clearly. . . .

With respect to the other pieces, I find that the witness was duly subpoenaed. I find that on the 12th of August of 2019, the witness received a call from family members that his mother in the country of Guinea, . . . had taken ill, was in the hospital in a coma. The fact that the witness didn't remember the exact name of the cousin who called him, to me, frankly, is not of big moment. You get a call out of the blue, not expecting it, I find, which is what happened here, that mom not only has taken ill, but is in the hospital in a coma, that's what you're paying attention to. He was concerned his mother was gravely ill. I find that, on the very next day, he flew back home. That he booked a ticket, and while he didn't fly non-stop, he left the United States and flew back to the country of Guinea in West Africa. I find that his U.S. Visa expired in 2018, and while it may very well be that his remaining in the United States post the expiration of his Visa exposed him to federal deportation or federal penalties, the long and the short of it is I couldn't even

3

tell you the number of folks who are here under those circumstances, whether it be through inadvertence or students who forgot or -- it doesn't matter.

But what happened here, I find, is the gentleman, since he's left the United States, cannot lawfully re-enter. I find he does not have a valid Visa. I find, based on the evidence presented, there is no . . . reasonable expectation that he'll even get one because he will have to reveal to the immigration authorities that he probably knowingly overstayed his prior Visa and the chances of him getting a new one are probably not high. So, his ability to lawfully re-enter the United States, based on the information I have, is nominal at best.

Second, I find that this is neither a sham nor a ruse. While he came across as somewhat weary and concerned, he has made himself available to the State court system via Skype when, frankly, we can't make him do that. Nobody is putting a gun to this guy's head to make him communicate to make him be available. I find that he's trying to comply and to do the right thing. He simply, I find, cannot lawfully re-enter the United States at any time. So, even if, God willing, mom got better tomorrow and you put him on an airplane, he can't get lawfully through immigration.

There is, I find, an important public policy in this case. That is that all persons who are in this country, regardless of why they're here, regardless of whether it is or isn't lawful for them to be here, are entitled to the protection of our criminal laws and are entitled, if they are the victim of a crime, to be heard and to have a case decided by a jury. To me, that is an overriding and important public policy. Just as important as solving cold cases was in . . . *White*. All persons -- it would be, in my judgement, a sad place for this country to be if we said, you know, there's more than one class of victim. There are certain victims who are going to be, let their cases go to trial, but if you happen to be in this country illegally and you're the victim of a crime and you happen to step over the border, your case goes away because, since you can't lawfully come back, your alleged assailant goes free. I find that to be appalling, were that the case, and I am not persuaded that that is proper public policy. Of course, I don't make policy, but in terms of the public interest at stake, this case, in all the respects, I am persuaded fits quite neatly within what Judge Leahy explicated [in *White*], and I'm not going to go through all of their pieces and reasoning in *White v. The State*, but this is as close as it gets to in person confrontation. This isn't even remarkably similar to *Craig*, where Justice O'Connor allowed the witness not to see the defendant. Well, this witness sees the defendant. The defendant sees the witness. Everybody sees everybody in real time, and I am . . . highly confident we can arrange the TV screen, just like I did yesterday in a trial, so

the jury and everybody sees everybody.  That is not a technical problem in this day and age.

* * *

Simply, technology evolves, and sometimes, albeit slowly, the courts evolve with it.  There's no question that a defendant's right to confront an accuse[r] is paramount, and it is also quite clear that the defendant's right to confront an accusatory witness may be satisfied absent a face to face in the courtroom.  Here we have face to face over, I find, a reliable technological medium, and it would not deny his rights under the Sixth Amendment to the federal constitution or the Maryland [constitution]. . . .

I'm also persuaded that the necessity here was not created by the State.  They didn't cause the witness not to be here . . . .  I actually am persuaded, in the affirmative, that the witness's family had a true medical emergency, and the witness simply didn't high tail it out of Maryland to avoid appearing in the courtroom.  If I thought he did, this might come out a different way.  Another factor that I consider is the nature of the testimony the witness is going to give.  This is not a case -- although I understand it's perhaps only of peripheral significance, it is simply part of the mix, not a case where this particular witness is going to make an in court identification of the defendant or a case where the State is going to use a prior identification of the defendant by this witness to put in front of the jury.  What this witness, I am told, is going to basically say something that's not really contested.  That a crime occurred and that he was a victim.  The real question here is whether this defendant had any role in the crime.  That's what's contested. . . .

So, I am persuaded as to the reliability of the two way Skype procedure.  I find there are important public policies to vindicate, which I am weighing and balancing harmoniously in consideration of the defendant's Sixth Amendment rights to confront his accusers through what I would call a quasi-physical presence, because this is not like *Craig*, where it was absent, and this is not a case like *Yates* where somebody simply said, "I don't want to go."  I find this witness, if the State had the ability to hand him lawful entry into the United States, he'd take it in a minute.  He can't get it, and he knows it.  Those are my findings.

Following this ruling, defense counsel objected to the adequacy of the Skype technology, arguing that the phone screen that Sanoh was watching was too small to afford a "face to face confrontation" because he "can't even make out the features of the person's

5

face." The court was not persuaded, noting, "I can't tell you how many cases that I've had where family members Skype each other using their iPhones. . . . I mean, it's ubiquitous, common."

Mr. Sanoh testified via Skype as the State's first witness. At the conclusion of his testimony, defense counsel objected that his attempt to impeach Sanoh had been impaired by "technical" difficulties with the State's computer. The court disagreed, ruling that impeachment had been effective, and then emphasized that "[w]hat's important for the Sixth Amendment is the defendant and the witness having that ability to look each other in the eye, and here they did."

*Trial*

We briefly summarize the trial record as background for our discussion of the issue Spinks raises. During trial, the State presented evidence that while looking for "afterparties" outside a Silver Spring bar that night, Oumar Sanoh encountered a stranger who told him he knew of one. Sanoh, who had borrowed his brother's vehicle that evening, drove the person he later learned was Najie Walker to the Sligo House Apartments. While Walker went into the building, ostensibly to ask if Sanoh could join the party, Sanoh remained in the parked car. After waiting for a period of time, Sanoh called the number Walker gave him but could not reach him.

Eventually, Walker returned to Sanoh's car with another man, who was later identified as Spinks. Walker got into the front passenger seat, pulled out a handgun, and robbed Sanoh. According to Sanoh, Walker's companion got into the back-passenger seat and held him from behind while Walker was holding the gun to Sanoh's neck. Among the

6

items taken from Sanoh was a distinctive white "Gucci bag" containing $1,640 in cash, which Sanoh's brother had collected to send to their family in Guinea.

Sanoh called 911 to report the robbery, remaining in the parking lot until police arrived. He provided police with the phone number that Walker gave him, which later corresponded to a phone in Walker's possession.

Security camera footage showed Spinks and Walker returning to the apartment building. Cell phone evidence established that Spinks's phone made two calls to Walker's phone number on February 18 and that a number with a caller identification of "Najie" called Spinks's phone twice while police were interviewing Spinks on March 1, 2019.

When police questioned Spinks, he admitted being present when Walker unexpectedly committed a robbery, but insisted that he was not aware of Walker's plan, that he never touched Sanoh, and that he did not participate in any way. Instead, Spinks maintained that when he twice opened the car door to get out of the car, Walker told him "not to get out because he had a gun."

Spinks testified in his defense, explaining that he was living with his fiancée and son in that apartment building. That evening, his fiancée wanted to smoke some marijuana. When Spinks left the apartment to smoke a cigarette, he ran into Walker. Spinks asked if Walker had any marijuana, and Walker replied that he should follow him if he wanted some.

Spinks followed Walker out of the building, to a car. When Walker got into the front passenger seat, Spinks got into the back passenger seat, thinking he was "getting a bag of weed from the guy sitting in front." But the "guy" asked Walker if he "still got that

7

40" and took two twenty dollar bills out of his pocket. Walker produced a bag of marijuana, then said, "F that. Give it all up" and pulled out what appeared to be "a weapon."

Walker took Sanoh's keys and phone, handed them to Spinks, and searched the vehicle. After Walker ran from the car back to the building, Spinks returned Sanoh's keys and phone, apologizing and saying he did not know that was going to happen.

## DISCUSSION

Spinks contends that the trial court "erred in allowing Sanoh to testify via Skype because the State failed to make an adequate showing of necessity and otherwise assure the reliability of the testimony." The State counters that "[t]he trial court here made detailed findings—which are not clearly erroneous—concerning the facts of Sanoh's situation that made his remote testimony necessary, as well as the features of Skype, as used at trial here, that gave his testimony assurances of reliability." For reasons that follow, we agree with the State that "[t]he trial court carefully considered" the applicable constitutional standards, did not commit clear factual error, and did not violate Spinks's Sixth Amendment right to confront his accuser by allowing Sanoh to testify via Skype.

### Sixth Amendment Standards Governing Skype Testimony

The Confrontation Clause of the Sixth Amendment guarantees a criminal defendant "the right . . . to be confronted with the witnesses against him." U.S. Const., amend. VI; *see also* Md. Decl. Rts., Art. 21. When determining whether a defendant's right to confrontation has been violated, this Court conducts its own independent constitutional appraisal, "by reviewing the law and applying it to the peculiar facts of the particular case." *Longus v. State*, 416 Md. 433, 457 (2010) (quoting *Jones v. State*, 343 Md. 448, 457

8

(1996)). In doing so, we accept the trial court's factual findings unless they are clearly erroneous. *Id.*

Essential elements of the right of confrontation include "physical presence, oath, cross-examination, and observation of demeanor by the trier of fact," because these enable a criminal defendant to challenge "the reliability of the evidence against [him] by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Maryland v. Craig*, 497 U.S. 836, 845–46 (1990). Yet the right to a witness's physical presence in the courtroom is neither absolute, nor "the *sine qua non* of the confrontation right." *Id*. at 847, 850. "Supreme Court precedent establishes that the Confrontation Clause reflects a 'preference' for physical face-to-face confrontation." *White*, 223 Md. App. at 390 (citing *Craig*, 497 U.S. at 849). In some circumstances, however, that preference may "give way to considerations of public policy and the necessities of the case." *Id*. at 849 (quoting *Mattox v. United States*, 156 U.S. 237, 243 (1895)). Consequently, "a defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured." *Id*. at 850.

For example, the seminal decision in *Craig* affirmed the constitutionality of this State's statute authorizing testimony by a child victim via one-way closed-circuit television. *Id.* at 859–60; *see also* Md. Code (2001, 2018 Repl. Vol.), § 11-303 of the Criminal Procedure Article (current statutory provision). The Supreme Court held that such a procedure does not violate the Sixth Amendment right to confrontation when it is

necessary to further the State's strong interest in protecting the child victim from the emotional trauma of having to testify in the defendant's presence, and when the procedure used adequately preserves the other elements of confrontation that establish indicia of reliability. *Id*. at 857. Before admitting such video testimony, however, a court must hear evidence and make a case-specific finding that it "is necessary to further an important state interest." *Id*. at 852.

Since the Supreme Court approved one-way video testimony, during which the defendant could not simultaneously see or hear the complaining victim, other courts have considered the constitutionality of two-way video testimony such as Skype, during which the witness testifies "in real time" from a remote location into the courtroom, allowing the witness, defendant, and fact-finder to see and hear each other. Most courts have applied the "*Craig* standard" to two-way video testimony. *See, e.g.*, *United States v. Carter*, 907 F.3d 1199, 1206 (9th Cir. 2018); *United States v. Yates*, 438 F.3d 1307, 1313–17 (11th Cir. 2006); *United States v. Bordeaux*, 400 F.3d 548, 554–55 (8th Cir. 2005); *Iowa v. Rogerson*, 855 N.W.2d 495, 504–06 (Iowa 2014); *Lipsitz v. Nevada*, 442 P.3d 138, 137–38 (Nev. 2019); *cf. Wrotten v. New York*, 560 U.S. 959, 959 (2010) (Sotomayor, J., dissenting from denial of *certiorari*) (recognizing that whether "a two-way video that enabled the testifying witness to see and respond to those in the courtroom, and vice versa," violated a defendant's confrontation right is an "important" question that was "not obviously answered by *Maryland v. Craig*"). *But see United States v. Gigante*, 166 F.3d 75, 81 (2nd Cir. 1999) (declining to require a finding of *Craig*-based necessity before allowing witness to testify via two-way video platform).

10

Like most other jurisdictions that have addressed this issue, Maryland courts have allowed two-way video testimony only when the *Craig* standard is satisfied. In *White v. State*, 223 Md. App. 353 (2015), we affirmed decisions to allow a retired serologist who had handled evidence in two different "cold cases" to give trial testimony, *id.* at 362–63, via Skype in one case and via WebEx in another, *id*. at 401. The forensic witness's testimony provided an essential link in the chain of custody for DNA evidence that tied the accused to both crimes. *Id*. at 386. When prosecutors learned, three days before the first trial, that the witness could not travel from Arizona due to a back condition, they proposed taking her testimony via Skype. *Id*. at 387–88.

After holding a test hearing to examine the witness, the trial court permitted the forensic witness to testify at trial via Skype. *Id*. at 388. One month later, in the second case, a different trial judge held a WebEx hearing, during which the witness testified that her condition had not improved. *Id*. at 388–89. That court also found the witness "reliable" and concluded that her remote video testimony was justified by "important public policy considerations of justly resolving criminal cases while protecting the well being of the witnesses and resolving cold cases based on advances in science and technology." *Id*. at 389 (internal quotation marks omitted).

Although this Court recognized that "[t]he Maryland Rules do not address the use of video conferencing in criminal trials[,]" we pointed out that other rules permit two-way video testimony in different contexts, including an initial appearance in district court "so long as the chief judge thereof has approved the use of video conferencing in that county[,]" *see* Md. Rule 4-231(d); in *habeas* proceedings, *see* Md. Rule 15-309(b)(2); and in judicial

11

review of agency adjudications, *see* Md. Rule 7-208(c).[2]  *White*, 223 Md. App. at 390 n.32.

At issue in that criminal appeal, however, was whether the State's presentation of Skype

testimony, over defense objection, violated the Confrontation Clause.  *Id*. at 386.

Following *Craig*, we acknowledged that

> [e]ven the most cutting-edge technology cannot wholly replace the weight of in-court testimony, for the electronic delivery of that testimony—no matter how clearly depicted and crisply heard—is isolated from the solemn atmosphere of the courtroom and compromises human connection to emotions like fear, apprehension, or confusion.  Accordingly, we hold that the *Craig* standard applies when the State seeks to present witness testimony via two-way video conference against a defendant in a criminal proceeding. And, the issues this Court must resolve pursuant to the standard set forth in *Craig* are whether [the witness's] testimony via a two-way medium was reliable; whether the denial of Appellant's right to confront her in person furthered an important public policy; and whether the court made a sufficient finding of necessity.

*Id.* at 392–93.

Applying that Sixth Amendment test and analytical framework, we concluded that

testimony given via both the Skype and WebEx platforms, "absent any technological

complications," adequately "provided the traditional indicia of reliability," by allowing the

witness to be sworn under oath, to be questioned in a manner that allowed the jury to

observe her demeanor, and to be cross-examined.  *Id*. at 393.  In evaluating whether such

video-conferencing was necessary to serve an important public policy, we emphasized that

"convenience and efficiency are not sufficiently important public policies to warrant

dispensing the right to physical face-to-face confrontation[,]" *id*. at 395, but distinguished

---

[2] The provision in Rule 7-208(c) allowing for video conferencing was removed in 2018 and consolidated with other similar provisions into Rules 2-801 through 2-805.

cases when "the need to protect the well-being of a medically infirm witness" is at stake. *Id.* at 396–98. "[E]mphatically caution[ing]" that there must be "necessity—not simply convenience or expediency—in order to deny a defendant his right to physically confront his adversaries in a court of law[,]" we concluded that "a court must render an adequate, case-specific finding based on the evidence presented that the two-way video conference is necessary to further the identified public policy." *Id.* at 398.

Ultimately, we held that "the combined public policy justifications of resolving cold cases and simultaneously protecting the physical well-being of a significant witness are sufficient under *Craig* to warrant the absence of [the forensic witness's] in-court testimony in this case." *Id.* Moreover, the Skype and Webex platforms provided sufficient transmission quality that, "absent any technological complications[,]" established "the traditional indicia of reliability under the Confrontation Clause." *Id.* at 393.

Following our decision in *White*, the Court of Appeals held that the use of Skype testimony may be a reasonable and necessary means of presenting evidence in a civil proceeding when a foreign witness cannot be compelled by subpoena to testify in person. In *Att'y Grievance Comm'n of Md. v. Agbaje*, 438 Md. 695, 719–20 (2014), the Court found good cause to allow Skype testimony in a bar disciplinary hearing because the complaining client-witness was beyond its subpoena power.

In 2018, the Court of Appeals adopted Md. Rules 2-803,[3] 2-804, and 2-805,

---

[3] Rule 2-803 provides in pertinent part:

(continued . . .)

13

establishing new standards for video testimony during civil proceedings, in an effort to

"expand[] and consolidate[] existing Rules dealing with remote electronic participation in

judicial proceedings." *Standing Comm. on Rules of Practice and Procedure, Notice of*

*Proposed Rule Changes*, 195th Report, at 7 (Feb. 6, 2018). The new rules include specific

standards for two-way video testimony, which are designed "to take advantage of the

technology that allows for reliable interactive communication to provide for more efficient

---

**(a) In General.** Subject to section (b) of this Rule and Rule 2-804, a court, on motion or on its own initiative, may permit . . . participants to participate in an evidentiary proceeding by means of remote electronic participation (1) with the consent of all parties, or (2) in conformance with section (c) of this Rule. . . .

**\* \* \***

**(c) Absence of Consent; Required Findings.** In the absence of consent by all parties, a court may exercise the authority under section (a) only upon findings that:

(1) participation by remote electronic means is authorized by statute; or

(2) the participant is an essential participant in the proceeding or conference; and

(A) by reason of illness, disability, risk to the participant or to others, or other good cause, the participant is unable, without significant hardship to a party or the participant, to be physically present at the place where the proceeding is to be conducted; and

(B) permitting the participant to participate by remote electronic means will not cause substantial prejudice to any party or adversely affect the fairness of the proceeding.

*Committee note*: It is not the intent of this section that mere absence from the county or State constitute good cause, although the court may consider the distance involved and whether there are any significant impediments to the ability of the participant to appear personally.

14

access to the courts, without sacrificing the required fairness in judicial proceedings." *Id.*[4]

Applying these lessons to the *Craig/White* analytical framework for determining whether two-way video testimony comports with the Sixth Amendment right of confrontation in this criminal case, we hold that the trial court did not err in allowing Sanoh to testify via Skype. The preliminary hearing comported with the procedure approved in *White* for testing the reliability of the Skype platform and for determining individualized necessity and public policy. For reasons that follow, we conclude that the State established a constitutionally valid predicate for permitting Sanoh to testify via Skype.

*Reliability*

First, the trial court found that, as in *White*, Skype provided a sufficiently reliable

---

[4] Among the relevant "conditions" established by Rule 2-804 is that "remote electronic participation shall not be permitted unless the process, including connections, software, and equipment, to be used comply with standards developed by the State Court Administrator and approved by the Chief Judge of the Court of Appeals pursuant to Rule 2-805." Md. Rule 2-804(b)(1). Under Rule 2-805, the "minimum standards" for video testimony

include the following requirements:

(1) All participants shall be able to communicate with each other by sight, hearing, or both as relevant.

(2) Unless waived by the participants, all participants shall be able to observe all physical evidence and exhibits presented during the proceeding, and the program shall permit participants to transmit documents as necessary.

(3) Video quality shall be adequate to allow participants and the fact-finder to observe the demeanor and non-verbal communications of other participants. Sound quality shall be adequate to allow participants to hear clearly what is occurring where each of the participants is located.

15

technological platform to present Sanoh's testimony. The court emphasized that the video transmission delivered a clear picture and sound, with only a slight sound delay. The court pointed out that Sanoh was under oath; that the prosecutor, defense counsel, and the court were free to question the witness "in real time"; and that Spinks, counsel, the judge, and the jury were able to observe his demeanor on a large screen in the courtroom. Although defense counsel objected that Sanoh was using his cell phone, so that his view of the proceedings was necessarily limited to the size of that screen, the court found that Sanoh had an adequate view of the courtroom proceedings. As in *White*, this Skype technology was reliable enough to afford Spinks a constitutionally sufficient opportunity to confront the witness.

We are not persuaded otherwise by Spinks's belated complaint that the oath sworn by Sanoh lacked the same efficacy as if it had been made in a Maryland courtroom, given that "[t]he threat of a possible perjury prosecution . . . is nonexistent for someone residing in another country in another continent who cannot legally reenter the United States." Spinks did not preserve this objection because he did not make that argument to the trial court, when the court could have redressed his concerns by examining Sanoh regarding his understanding of the seriousness and solemnity of the matter. Absent any such colloquy, Sanoh's willingness to testify, the undisputed fact that he was robbed, and his strong desire to return to the United States indicate that he had incentive to testify truthfully in order to avoid a perjury charge that may have prevented him from obtaining a new visa.

*Public Policy*

The trial court also found that allowing Sanoh to testify via Skype furthered the

16

"important public policy" of prosecuting violent crimes committed in Maryland against individuals whose citizenship and immigration status prevents them from being present to testify at trial. A contrary ruling, the court pointed out, would mean that the State could not prosecute an armed robber whose victim is not a U.S. citizen and cannot remain in the United States or return to testify at trial due to visa or other immigration obstacles. In the trial court's view, "all persons who are in this country, regardless of why they're here, regardless of whether it is or isn't lawful for them to be here, are entitled to the protection of our criminal laws and are entitled, if they are the victim of a crime, to be heard and to have a case decided by a jury." The court ruled that to avoid creating "more than one class of victim[,]" and to prevent the assailant from going free, it is necessary to allow such victims to testify remotely when they "can't lawfully come back."

We agree that requiring in-courtroom testimony under these circumstances would undermine the important policy of protecting members of the public from violent crime. In particular, precluding prosecutions based on the inability of a foreign witness who cannot legally return to this country to testify in the courtroom would increase both the risk of violent offenders remaining at large and the risk of foreign individuals being targeted as victims because they may not be able to testify in person.

### Necessity

Finally, the court found that testifying remotely was necessary because of Mr. Sanoh's family emergency, lack of U.S. citizenship, and visa status. As in *Agbaje*, Sanoh was an essential fact witness who was in another country, beyond the subpoena power of the State. Moreover, the court found that his reason for leaving Maryland was genuine and

17

reasonable, based on his mother's sudden hospitalization. Of particular import is that Sanoh wanted to return for trial, but could not, because he is not a U.S. citizen, did not have a visa, and would not be likely to obtain one in the reasonable future given that he overstayed his previous visa. As the trial court pointed out, Sanoh's reentry obstacles distinguish his situation from instances when a foreign witness is simply unwilling, for reasons of expense or inconvenience, to travel to the United States in order to testify in person. *See, e.g.*, *Yates*, 438 F.3d at 1316 (holding that trial court erred in allowing remote testimony by two essential witnesses who were unwilling to travel from Australia). These circumstances are sufficient to establish the necessity contemplated by *Craig* and *White*.

We find nothing in the trial record to support Spinks's appellate claim that the State should have been required to prove that it could not assist Sanoh in returning for a postponed trial. Although Spinks claims that the State has "power . . . to assist in securing the in-court presence of non-citizen victims[,]" he cites no supporting legal authority. In any event, the trial court implicitly rejected any suggestion that the State could secure Sanoh's presence when it found "no reasonable expectation that he'll even get [a visa] because he will have to reveal to the immigration authorities that he probably knowingly overstayed his prior [v]isa and the chances of him getting a new one are probably not high."

*Conclusion*

Based on our independent review of this record, we hold that the trial court did not violate Spinks's Sixth Amendment right of confrontation by allowing this robbery victim to testify via Skype. The Skype platform allowed Spinks to confront Sanoh in real time, under oath, and via a two-way platform featuring clear video and sound. Accordingly, the

18

Skype platform preserved all of the important elements of confrontation aside from face-to-face courtroom testimony. Additionally, the denial of Spinks's right to face-to-face confrontation was permissible because public policy supports the use of such video technology to enable prosecution of violent crimes against a victim whose citizenship and immigration status prevent him from testifying in person. Finally, the trial court here made adequate, case-specific findings that the use of video technology in this case was necessary because Sanoh reasonably left the United States in response to his mother's medical emergency, and that Sanoh could not lawfully return to Maryland to testify at trial.

**JUDGMENTS OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**
