

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 36060-1-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | PUBLISHED IN PART OPINION |
| | ) | |
| ABDUL RAHMAN SWEIDAN, | ) | |
| | ) | |
| Appellant. | ) | |

FEARING, J. —

> *Now when some days had passed, Agrippa the king and Bernice arrived at Caesarea to welcome Festus. And as they stayed there many days, Festus laid Paul's case before the king, saying, "There is a man left prisoner by Felix; and when I was at Jerusalem, the chief priests and the elders of the Jews gave information about him, asking for sentence against him. I answered them that it was not the custom of the Romans to give up any one before* the accused met the accusers face to face, *and had opportunity to make his defense concerning the charge laid against him.* ACTS 25:16 (Revised Standard Version) (emphasis added).

This appeal raises important constitutional questions that Washington trial courts may increasingly face with the increased use of courtroom technology. Appellant Abdul Sweidan claims the trial court denied his right to face-to-face confrontation by allowing an Arabic interpreter, who overheard Sweidan mutter incriminating statements while

Sweidan received medical treatment at a hospital emergency room, to testify by video conference. The interpreter resided in Michigan, where she attended to her critically ill mother.

In the published section of our opinion, we hold that the trial court failed to adequately conduct a hearing and explain its ruling when authorizing video conference testimony. From experience, we recognize the difficulty encountered by superior courts when confronting unique questions of law during the course of a trial with the lack of time and resources to study the questions. Because we find any constitutional error to be harmless, we would otherwise not discuss the underlying merits of Abdul Sweidan's challenge to the video testimony, but we do so in this instance to provide guidance for trial courts asked to permit remote testimony in criminal prosecutions. In the unpublished portion of our opinion, we explain our ruling of harmless error.

Abdul Sweidan also assigns error to his daughter's testifying to his guilt, his exceptional sentence, the length of a no-contact order with his children, and the extent of his legal financial obligations. In the unpublished segment of our opinion, we affirm Sweidan's conviction for attempted second degree murder and his exceptional sentence. We remand for further consideration of the no-contact order and for the striking of a criminal filing fee as a financial obligation.

FACTS

The State of Washington prosecuted appellant Abdul Sweidan for repeatedly stabbing his wife, Dania Alhafeth, on August 30, 2017. We borrow the facts from trial testimony. We reserve most of the facts for the unpublished section of the opinion.

Abdul Sweidan and Daniah Alhafeth resided in a Kennewick apartment with their four children. The couple often quarreled. Sweidan sometimes accused Alhafeth of other romantic interests. Some arguments ended with Sweidan striking or pushing Alhafeth. Occasionally, Alhafeth hit back. When Alhafeth suggested divorce, Sweidan responded that he would rather kill Alhafeth than divorce.

On the night of August 29, 2017, Abdul Sweidan and Daniah Alhafeth bickered, after which Sweidan asked Alhafeth to reconcile. Alhafeth responded that reconciliation meant nothing, because the two would squabble again.

On August 30, 2017, according to the State's evidence, Abdul Sweidan returned home early from work and brutally stabbed Daniah Alhafeth numerous times with a kitchen knife. During the attack, Sweidan also cut his hand. As she lay bleeding on the living room floor, Alhafeth called a neighbor, who called 911. An ambulance ferried Alhafeth to Kennewick's Trios Hospital.

Abdul Sweidan drove himself to Trios Hospital for treatment to his hand and arrived at 1:37 p.m. Abdul Sweidan spoke primarily Arabic. During the course of his treatment, Trios Hospital called an Arabic interpreter, who assisted Sweidan in communicating with staff.

Maisa Haddad serves as a certified medical interpreter who works from her home in Michigan, where she also cares for her mother. Haddad provided the Arabic-to-English interpretation, through an iPad, for Abdul Sweidan at Kennewick's Trios Hospital. Haddad saw Sweidan and the attending physician on her screen while interpreting. Haddad observed Sweidan's cut fingers and heard him tell the treating physician the injuries occurred while cutting meat. According to Haddad, when medical staff left the room, she sat silently while Sweidan remained on her screen for fifteen minutes. Under company practices, Haddad could not ask the patient any questions. During Haddad's silence, Sweidan volunteered that his wife had pestered him. Sweidan cursed his wife and uttered: "may God not bless her." Report of Proceedings (RP) (April 5, 2018) at 767. Haddad did not respond to the comments.

PROCEDURE

The State of Washington charged Abdul Sweidan with attempted second degree murder and first degree assault. We outline now only the procedural background relevant

4

to the video conference testimony.  Before trial, the State presented a motion that asked

permission for Arabic interpreter Maisa Haddad to testify at trial by two-way video

conference.  In support of the motion, the State submitted a letter from Haddad sent to the

prosecuting attorney:

> I am writing with regard to the request for me to appear in-person for a testimony on the State [v]. Abdul Sweidan - Trios Hospital Medical Treatment Interpretation case.  I need to highlight that I would be unavailable to appear in-person before the court due to inability to travel for the following reason:
>
> I live in Michigan and I am the sole in home care-giver for my senior seriously ill mother who is suffering from serious medical conditions that require continuous medical care and I have to be available by her side at all times attending to her medical and other needs.  My mother suffers from **esophageal cancer** and serious **heart disease** and has recently undergone an open heart surgery.  This makes it impossible for me to travel and leave my mother, to whom I am the sole care provider and support.
>
> I have attached herein a letter from her doctor testifying to her medical condition.

Clerk's Papers (CP) at 166 (emphasis in original).  The physician, Fawaz M. Hasso,

M.D., wrote:

> RE: Heida Yousef Haddad
> To Whom it May Concern:
> This is to certify that Heida Yousef Haddad[,] the mother of Maisa Haddad[,] is suffering from Esophageal cancer and heart disease and needs continuous medical care for which Maisa[,] her daughter[,] need[s] to be with her[,] and she [Maisa] is unable to travel.
> Please feel free to contact my office if you have any questions or concerns.  Thank you for your assistance in this matter.

CP at 167. Neither Haddad nor Fawaz wrote their respective statements under oath or under penalty of perjury.

During oral argument in support of the motion for video testimony, the State noted that Maisa Haddad was only one of the State's twenty-five witnesses. The State characterized Haddad as having no attachment to the case. Thus, according to the State, her demeanor lacked importance.

Abdul Sweidan objected to the motion for remote testimony. He argued that the State failed to show Maisa Haddad's unavailability. Haddad had no physical impediment to traveling from Michigan to Washington State. Sweidan emphasized that the State presented no evidence that Haddad's mother faced imminent death. Other caregivers could provide for the mother. Haddad would not be absent from her mother for more than a few days. Thus, Sweidan contended that any video testimony would violate his right to confront witnesses under the state and federal constitutions.

The trial court granted the State's motion for testimony by video conference. The court commented that, based on a review of the testimony anticipated from Maisa Haddad and after balancing the concerns of the confrontation clause and the right of the parties to cross-examine the witness in court, Skype was an effective way for the witness to testify. The trial court did not enter any findings related to the granting of remote testimony.

At trial, Maisa Haddad testified via Skype with both video and audio. The prosecution examined Haddad, and defense counsel cross-examined her. The trial record does not describe the setup used for the video conference testimony, including what screens the State employed and whether the jury and Abdul Sweidan could see the demeanor of the witness.

In its closing, the State mentioned interpreter Maisa Haddad's testimony:

> And while she's sitting there with him, he starts cursing his wife. What do we mean by cursing? May God not bless her.
> So think about this. This is a woman who is a thousand miles away from Dania, no connection to her other than they both speak Arabic, and she hears him say something just like what Dania heard him say. To Dania he said, "May God not bring you back."

RP (April 13, 2018) at 1344-45.

The jury convicted Abdul Sweidan of attempted second degree murder and first degree assault.

LAW AND ANALYSIS

Video Conference Testimony

*Issue 1: Should we apply a de novo standard of review or an abuse of discretion standard of review when assessing whether the trial court erred when permitting Maisa Haddad to testify by video conference?*

*Answer 1: We decline to address this question.*

7

Abdul Sweidan assigns error to the trial court's permission for Maisa Haddad testifying by remote video. He argues that the ruling violated his constitutional right to confront face-to-face a witness presenting evidence against him.

The parties raise a threshold question of what standard of review to apply. Abdul Sweidan asks that we apply a de novo review standard. The State seeks an abuse of discretion standard at least as to the trial court's finding of necessity for video conference testimony. We decline to address this question in part because the trial court never entered a finding of necessity. Also, our decision would remain the same no matter the standard of review we employed.

*Issue 2: Did the State identify an important state interest when requesting video conference testimony?*

*Answer 2: Yes.*

The Superior Court Criminal Rules do not address the use of remote testimony. Washington courts acknowledge that, when the criminal rules fall silent, the Superior Court Civil Rules provide guidance in determining how to proceed. *State v. Cayetano-Jaimes*, 190 Wn. App. 286, 297, 359 P.3d 919 (2015). CR 43(a)(1) directs:

> (1) *Generally.* In all trials the testimony of witnesses shall be taken orally in open court, unless otherwise directed by the court or provided by rule or statute. *For good cause in compelling circumstances and with*

8

*appropriate safeguards*, the court may permit testimony in open court by contemporaneous transmission from a different location.

(Some emphasis added). Abdul Sweidan does not argue that the State did not fulfill the demands of CR 43(a)(1). He relies exclusively on the constitutional right to the confrontation of witnesses, although we note that the strictures of CR 43(a)(1) echo the demands discussed below emanating from the confrontation clause. We also focus on the constitutional right to face one's accusers, such that our ruling holds no precedence for civil trials.

Both the federal and state constitutions afford an accused the right to face witnesses presenting evidence against him or her. The United States Constitution declares:

In all criminal prosecutions, the accused shall enjoy the right to . . . be *confronted* with the witnesses against him.

U.S. CONST. amend. VI (emphasis added). The United States Supreme Court incorporated Sixth Amendment protections to apply to state prosecutions under the due process clause of the Fourteenth Amendment. *Illinois v. Allen*, 397 U.S. 337, 338, 90 S. Ct. 1057, 25 L. Ed. 2d 353 (1970). Under the state constitution,

In criminal prosecutions the accused shall have the right to . . . meet the witnesses against him *face to face*.

WASH. CONST. art. I, § 22 (amendment 10) (emphasis added).  RCW 10.52.060 confirms the right of every person accused of a crime "to meet the witnesses produced against him or her face to face."

According to the United States Supreme Court, the confrontation clause ensures the reliability of evidence against a criminal defendant by subjecting the evidence to rigorous testing in the context of an adversary proceeding before the trier of fact. *Maryland v. Craig*, 497 U.S. 836, 845-46, 110 S. Ct. 3157, 111 L. Ed. 2d 666 (1990). The word "confront," after all, means a clashing of forces or ideas, thus manifesting the notion of adversariness.  *Maryland v. Craig*, 497 U.S. at 845.  The confrontation clause also serves the symbolic goals of fairness and reliability in a prosecution.  *Lee v. Illinois*, 476 U.S. 530, 540, 106 S. Ct. 2056, 90 L. Ed. 2d 514 (1986).

The accused deserves the opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him or her to stand face to face with jurors so that jurors may look at the witness and judge by the witness's demeanor on the stand and manner of testimony whether the witness deserves belief.  *Mattox v. United States*, 156 U.S. 237, 242-243, 15 S. Ct. 337, 39 L. Ed. 409 (1895).  According to judicial psychology, the risk of a witness wrongfully implicating an innocent defendant wanes when testifying in the accused's presence.  *Maryland v. Craig*, 497 U.S. at 845-46 (1990).

A person encounters more difficulty when telling a lie about another to his or her face than behind his back. *Coy v. Iowa*, 487 U.S. 1012, 1019-20, 108 S. Ct. 2798, 101 L. Ed. 2d 857 (1988). In light of these considerations, the confrontation clause demands a witness be under oath, cross-examined, and subjected to observation of demeanor by the trier of fact. *Maryland v. Craig*, 497 U.S. at 851 (1990).

According to the United States Supreme Court, face-to-face confrontation forms the core value furthered by the constitutional confrontation right. *Maryland v. Craig*, 497 U.S. at 847 (1990). Thus, the confrontation clause prefers a face-to-face confrontation during trial. *Ohio v. Roberts*, 448 U.S. 56, 63, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980), *abrogated by Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). Nevertheless, the right to face-to-face confrontation between the accused and witnesses is not an indispensable element of the Sixth Amendment's guarantee of the right to confront one's accusers. *Maryland v. Craig*, 497 U.S. at 849-50. A literal reading of the confrontation clause would abrogate hearsay exceptions, a result deemed extreme. *Ohio v. Roberts*, 448 U.S. at 63 (1980). Considerations of public policy and necessities of the case, in narrow circumstances, may preempt the right of a physical face-to-face encounter. *Maryland v. Craig*, 497 U.S. at 849.

11

*Maryland v. Craig*, 497 U.S. 836 (1990) is the leading decision on the clash between video conference testimony and the confrontation clause. The United States Supreme Court addressed whether an exception existed to the confrontation right and held that it did. The Court determined whether a Maryland statute that permitted a child victim of abuse to testify by a one-way closed circuit television, in order to avoid seeing his or her abuser, violated the confrontation clause. The statute allowed a court to arrange for the accused to remain in the courtroom, while defense counsel and the prosecution conducted questioning in a separate room. The defendant and jury could see the testifying child witness on a monitor in the courtroom, but the child could not see the accused. The United States Supreme Court, in *Maryland v. Craig*, upheld Maryland's statutory procedure and noted that the trial court left intact all other elements of the confrontation right that safeguarded reliability of the testimony, including the oath, cross-examination, and the ability for all persons in the courtroom to see the demeanor of the witness.

In *Maryland v. Craig*, 497 U.S. 836 (1990), the United States Supreme Court announced a two-prong test which, when met, satisfies an accused's constitutional confrontation right without a physical face-to-face confrontation. The trial court must render a case-specific finding that (1) excusing the presence of the witness necessarily

12

furthers an important public policy, and (2) the procedure otherwise assures the reliability of the testimony. *Maryland v. Craig*, 497 U.S. at 850. Since *Craig*, all federal and state courts have applied this dual test.

Despite permitting closed circuit television or video conference testimony, in *Maryland v. Craig*, the United States Supreme Court warned about routinely permitting these substitutes for face-to-face confrontation. A trial court may not easily dispense with the right to face-to-face confrontation. *Maryland v. Craig*, 497 U.S. at 850 (1990). Before dispensing with the accused's right, the court must engage in a case specific, individualized determination of the necessity for testimony by other means. *Maryland v. Craig*, 497 U.S. at 855-56. In the case of a child witness, the trial court must hear evidence and determine whether use of the procedure is necessary to protect the welfare of the particular child witness who seeks to testify. *Maryland v. Craig*, 497 U.S. at 855-56. The court must enter a case specific finding.

Technology continually updates and improves remote communication, including video conferencing. Nevertheless, technological changes in the courtroom cannot come at the expense of the basic individual rights and freedoms secured by our constitutions. *Harrell v. State*, 709 So. 2d at 1372 (Fla. 1998). Confrontation through a video monitor is not the same as physical face-to-face confrontation, and the two are not constitutionally

13

equivalent. *United States v. Yates*, 438 F.3d 1307, 1315 (11th Cir. 2006). The electronic medium compromises the Sixth Amendment's guarantee of the right to confront one's accuser. *Commonwealth v. Atkinson*, 2009 PA Super 239, 987 A.2d 743, 751. Remote testimony may reduce or eliminate intangible elements of the ordeal of testifying in a courtroom. *United States v. Yates*, 438 F.3d at 1313.

Unlike the United States Constitution, article I, section 22 (amendment 10) of the Washington Constitution employs the phrase "meet the witnesses against him face to face." Some state courts, whose constitutions also contain or contained the wording "face to face," have held the use of video conferencing as a means to present testimony is always unconstitutional. *Commonwealth v. Ludwig*, 527 Pa. 472, 594 A.2d 281, 283-85 (1991); *Brady v. State*, 575 N.E.2d 981, 986-89 (Ind. 1991); *Commonwealth v. Bergstrom*, 402 Mass. 534, 524 N.E.2d 366, 374 (1988). Pennsylvania has since amended its constitution to omit the phrase "face to face." Other states have disagreed that remote testimony is always violative of the confrontation clause no matter the wording of the state constitution. *State v. Self*, 56 Ohio St. 3d 73, 564 N.E.2d 446, 450-53 (1990); *Commonwealth v. Willis*, 716 S.W.2d 224, 227 (Ky. 1986); *State v. Burns*, 112 Wis.2d 131, 332 N.W.2d 757, 764 (1983).

In *State v. Foster*, 135 Wn.2d 441, 466, 957 P.2d 712 (1998) (plurality opinion), four of the Washington Supreme Court justices, including the author of the lead opinion, held that the language "face to face" did not afford the accused any additional protections against remote testimony. The four justices emphasized an 1889 dictionary entry that defined "confront" to mean "to bring face to face." Thus, the United States Constitution's Sixth Amendment, with the phrase "confronted by witnesses," bears the same meaning as if the language read "face to face." A fifth justice, who joined the majority in holding RCW 9A.44.150 constitutional, disagreed that the State Constitution never afforded additional protections to the accused. RCW 9A.44.150 is Washington's version of the statute that allows a child witness, under limited circumstances, to testify by one-way video conference rather than in the physical presence of the accused.

In *State v. Foster*, the Washington Supreme Court adopted the *Craig* test for purposes of Washington Constitution's confrontation clause, thereby allowing remote testimony in limited circumstances. The state high court echoed the United States high court's perspective when declaring that, though fundamental and important, the defendant lacks an absolute right to confront a witness under the state constitution. *State v. Foster*, 135 Wn.2d at 473.

The Washington Supreme Court, in *State v. Foster*, and the United States Supreme Court, in *Maryland v. Craig*, issued rulings in the context of one-way closed circuit television, when the victim witness could not see the accused. Neither the United States Supreme Court nor the Washington Supreme Court has addressed two-way conferencing. Because two-way video conference testimony allows the jury and the accused to see the witness and the witness to see the jury and the accused, some States have argued that two-way conferencing does not implicate the confrontation clause. Nevertheless, a consensus of state and federal courts has applied the *Craig* test to two-way conferencing testimony. *United States v. Carter*, 907 F.3d 1199, 1208 (9th Cir. 2018); *State v. Rogerson*, 855 N.W.2d 495, 501-03 (Iowa 2014); *State v. Smith*, 2013 NMCA 081, 308 P.3d 135, 137; *Harrell v. State*, 709 So. 2d 1364, 1368-69 (Fla. 1998). Although two-way video testimony more closely resembles face-to-face confrontation than one-way video, two-way video is still not the equivalent of physical face-to-face confrontation. *State v. Rogerson*, 855 N.W.2d at 502-04; *Harrell v. State*, 709 So. 2d at 1368-69. Despite questioning of the truth of the assumption, courts postulate that the screen and the physical distance between the witness and the accused reduces the truth-inducing effect of confrontation. *State v. Rogerson*, 855 N.W.2d at 504. Virtual presence created by a television screen falls short of physical presence. *United States v. Bordeaux*, 400 F.3d

548, 554 (8th Cir. 2005); *State v. Smith*, 308 P.3d at 137. From the remote witness's point of view, the angle and quality of the courtroom camera and the size and quality of the witness's viewing screen will necessarily define the courtroom. *United States v. Carter*, 907 F.3d at 1207. In Abdul Sweidan's appeal, the State does not contend Maisa Haddad's video testimony automatically passed constitutional muster because of two-way conferencing.

Abdul Sweidan argues that the State of Washington failed to satisfy either requirement of the *Craig* test. The first prong of the *Craig* test requires the State to show denial of Abdul Sweidan's confrontation rights was necessary to further an important public policy interest. Sweidan argues that the State demonstrated no public policy sufficient to permit the dispensing of Sweidan's right to face-to-face physical confrontation. The State responds that a large number of jurisdictions have held that the need to care for a chronic illness serves an important public policy.

Abdul Sweidan emphasizes that *Maryland v. Craig* and *State v. Foster* addressed state statutes designed to protect child abuse victims, and Sweidan impliedly argues that only a statutory policy suffices to satisfy the first prong of *Craig*. The State relies on no statute in this appeal. Nevertheless, no decision holds that only public policy found in a statute can outweigh the right to face-to-face confrontation. Also, the issue of permitting

17

testimony by video most frequently arises with regard to child witnesses because of a fear

possessed by a child victim of seeing his or her abuser. Nevertheless, no decision holds

that only child abuse victims may benefit from being absent from the courtroom.

Courts define narrowly an "important public policy" for purposes of an exception

to the confrontation clause. *State v. Smith*, 308 P.3d at 138 (2013); *Commonwealth v.

Atkinson*, 987 A.2d at 748 (Pa. Super. Ct. 2009). The State's interest in protecting child

witnesses from the trauma of testifying in a child abuse case justifies the use of a special

procedure that permits a child witness to testify in the absence of face-to-face

confrontation. *Maryland v. Craig*, 497 U.S. 836 (1990). Outside the context of child

witness cases, courts have permitted the use of video conference testimony in two other

circumstances: when a witness is too ill to travel and when a witness resides outside the

United States. *Horn v. Quarterman*, 508 F.3d 306, 320 (5th Cir. 2007); *People v.

Wrotten*, 14 N.Y.3d 33, 923 N.E.2d 1099, 1103 (2009); *Commonwealth v. Atkinson*, 987

A.2d at 748. The State has a legitimate interest in protecting the witness from physical

danger and suffering. *Horn v. Quarterman*, 508 F.3d at 320. When the witness is

essential to the case and the witness is located in another country outside the subpoena

authority of the State, the State's interest in a just and expeditious resolution of the

prosecution trumps face-to-face confrontation. *United States v. Abu Ali*, 528 F.3d 210,

239-41 (4th Cir. 2008); *Harrell v. Butterworth*, 251 F.3d 926, 931 (11th Cir. 2001). The trial court may also permit an overseas active-duty soldier to testify by video conference. *Rivera v. State*, 381 S.W.3d 710, 711 (Tex. Ct. App. 2012).

Courts have deemed other policies or goals insufficient to allow remote video testimony. The State's need for video conference testimony to prove or efficiently present its case is not a sufficient public policy to outweigh the accused's right to confront an accuser face-to-face. *United States v. Yates*, 438 F.3d at 1316 (11th Cir. 2006); *United States v. Carter*, 907 F.3d at 1208 (9th Cir. 2018); *State v. Rogerson*, 855 N.W.2d 495, 502 (Iowa 2014). Convenience and cost saving do not suffice. *State v. Rogerson*, 855 N.W.2d at 507; *State v. Smith*, 308 P.3d at 138; *Commonwealth v. Atkinson*, 987 A.2d at 751. Convenience for the witness's employer also does not preempt face-to-face confrontation. *State v. Smith*, 308 P.3d at 138. Nor do security concerns eclipse the right to face-to-face confrontation. *Commonwealth v. Atkinson*, 987 A.2d at 750. The fact that the witness is helpful to the prosecution does not add another category for permitting video conference testimony. *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 313-14, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009). Unwillingness to travel is not a sufficient reason to dispense with the physical presence requirement, and a court should consider reasonable alternatives permitting face-to-face testimony. *United States*

*v. Carter*, 907 F.3d at 1208 (9th Cir. 2018); *United States v. Yates*, 438 F.3d 1307, 1317-18 (11th Cir. 2006). We recognize transportation of Maisa Haddad to Washington and back would expend fuel, but no court has validated video conference testimony by the reduction of the witness's carbon wheelprint.

The State of Washington's witness, Maisa Haddad, resided in Michigan. That distance alone does not create a necessity for video testimony. Haddad remained within the subpoena power of Washington State. Washington has adopted the Uniform Act to Secure the Attendance of Witnesses from Without a State in Criminal Proceedings, under which the Washington court could direct a Michigan court to command the presence of Haddad to testify in Washington State. RCW 10.55.060. The State of Michigan reciprocates. MICH. COMP. LAWS ANN. § 767.92.

The State may impliedly suggest that the importance of Maisa Haddad as a witness may support a finding of an important public policy. Based on precedent holding that the convenience of important witnesses does not qualify as a sufficient public policy, we rule that the importance to the State of Maisa Haddad's testimony failed to support a finding of an important public policy.

The State mentions that, in *State v. Cayetano-Jaimes*, 190 Wn. App. 286 (2015), this court held that the trial court committed error when refusing to permit telephonic

20

testimony by an adult witness unavailable to testify in the courtroom due to deportation to Mexico. Nevertheless, the defendant sought to introduce the testimony of the critical witness, who could not return to the United States. The State successfully argued before the trial court for the preclusion of the testimony. The high court based its ruling on an accused's Sixth Amendment right to present a complete defense, not on the confrontation clause. The opponent of the remote testimony, the State, probably lacked any constitutional right to confront the accused's witnesses.

Many decisions support the proposition that an illness of the witness suffices to permit a witness to testify by video. In *Horn v. Quarterman*, 508 F.3d at 313 (5th Cir. 2007), a Texas jury convicted Patrick Horn with capital murder and sentenced him to death. Horn filed a petition for habeas relief claiming in part that the trial court denied him the opportunity to confront a witness when the witness testified via two-way closed-circuit television. The appeals court denied relief because the state court correctly permitted a terminally ill witness, whose doctor advised against travel, to testify remotely.

In *Harrell v. Butterworth*, 251 F.3d at 931 (11th Cir. 2001), David Harrell argued the trial court violated his write to confrontation when the court permitted two witnesses to testify via satellite from Argentina. On habeas review, the court reviewed the trial court's decision to excuse in-person confrontation of two witnesses essential to the

State's case.  The trial court had found the witnesses lived beyond the subpoena power of the court, there was no way to compel them to appear, and one of the witnesses was ill and could not travel.

In *State v. Sewell*, 595 N.W.2d 207 (Minn. Ct. App. 1999), Jeffrey Sewell challenged his conviction for second degree felony murder, while arguing that the trial court improperly permitted the testimony of witness William Hurt through interactive television.  The State alleged that Sewell admitted to the murder when speaking with fellow inmate Hurt.  At the time of trial, Hurt suffered from medical problems, and he was under a medical restriction not to travel.  The reviewing court upheld the use of the video testimony.

In *Stevens v. State*, 234 S.W.3d 748 (Tex. App. Fort Worth 2007), the state Court of Appeals held that video testimony of a 75-year-old witness suffering from medical problems did not violate the confrontation clause.  The witness's cardiologist wrote a letter to the court explaining the witness had a well-documented medical history demonstrating a tenuous health status.  The cardiologist wrote that testifying could have ramifications on his health.

Contrary to the witnesses in the cited decisions, Maisa Haddad was not too ill to travel.  Instead, this appeal presents the unique situation of the witness declining to travel

22

because of the need to care for a suffering family member.  Abdul Sweidan contends that, since exceptions to face-to-face confrontation are narrow and no court has identified the illness of a mother warranting an exception, we should deny the State's promotion of an important public policy.

The parties forward no appellate decision addressing these circumstances.  We also find no decision directly relevant.  Nevertheless, we conclude that the important policy of alleviating physical pain and suffering can extend to the circumstances when the witness would attend to another's needs resulting from such suffering.  No reason exists to distinguish between the aching of the witness and the hurting of a witness's close family member.  Whether Maisa Haddad needed to care for the mother, however, poses a different question.

*Issue 3: Did the State establish the necessity to present the testimony of Maisa Haddad by video in order to further an important state interest?*

*Answer 3: No.  If we held the video conference testimony to be harmful, we would reverse the conviction or at least remand for an evidentiary hearing on the necessity of the video conference testimony.*

We continue to address the first of the two *Craig* prongs.  Under the first element, the State must show that excusing the presence of the witness *necessarily* furthers an

23

important public policy. *Maryland v. Craig*, 497 U.S. at 850 (1990). Viewed in this light, *Maryland v. Craig* actually establishes a three-part test: (1) the presence of an important public policy, (2) remote testimony necessarily furthers the public policy, and (3) the procedure otherwise assures the reliability of the testimony. Reported decisions focus on whether the government identifies an important public policy and only incidentally address the necessity portion of the first prong.

The word "necessity" can bear an emphatic connotation. For example, *Black's Law Dictionary* defines the companion word "necessary" as "essential." BLACK'S LAW DICTIONARY 1192 (11th ed. 2019). Nevertheless, the word has shades of meaning, from absolute physical necessity to convenience. *McCulloch v. State*, 17 U.S. 316, 413-15, 4 L. Ed. 579 (1819). The law rarely, if ever, requires absolute or indispensable necessity in any setting. *Central Puget Sound Regional Transit Authority v. WR-SRI 120th North LLC*, 191 Wn.2d 223, 245, 422 P.3d 891 (2018). Generally, the word "necessary" means reasonable necessity, under the circumstances of the particular case. *Central Puget Sound Regional Transit Authority v. WR-SRI 120th North LLC*, 191 Wn.2d at 245.

Because the use of video conference testimony implicates an accused's critical constitutional right, we do not consider the word "necessity" to connote mere convenience, particularly in light of reported decisions that declare convenience does not

24

qualify as an important public policy. We may be unable to circumscribe the meaning of necessity in this appeal's context beyond concluding that the word means something more than "convenient," although something less than "absolute physical necessity."

The trial court never entered a finding or commented in its oral ruling about the necessity of Maisa Haddad's testifying remotely. Abdul Sweidan raised legitimate questions at trial, and he repeats those questions on appeal, about the purported need for Haddad to remain in Michigan. The letters of Maisa Haddad and the mother's physician beg the question of whether another caregiver could have cared for the mother in the absence of Haddad for three days. We also wonder if the mother would have recovered in the near future or if the mother was terminally ill and would have died in the near future such that the court could have postponed trial for Haddad to later appear in Washington State.

In *United States v. Carter*, 907 F.3d 1199 (9th Cir. 2018), the Ninth Circuit Court of Appeals overruled the district court when that court failed to look for alternatives to an adult witness's testifying remotely. The State charged Laron Carter with fourteen counts of trafficking and prostituting seven minor girls. One victim witness stated she could not travel to the trial due to her late pregnancy. The Ninth Circuit overturned the district court's decision to permit the remote testimony of this witness, while reasoning that

pregnancy is a temporary disability and therefore alternatives existed to ensure the witness faced Carter in person. These alternatives included granting a continuance or severing the counts involving the witness.

The decision most analogous is *Bush v. State*, 2008 WY 108, 193 P.3d 203 (Wyo. 2008), which decision addresses necessity. In a prosecution for first degree murder, the trial court allowed the prosecution to present testimony of an elderly couple who recognized David Bush's pickup truck as the truck that passed them at a high rate of speed shortly after the murder. The couple also saw two large plastic bags in the bed of the truck. The husband developed congestive heart failure and renal failure one week before trial and could not travel from his home in Colorado to Wyoming. The wife did not wish to leave the husband alone. The decision does not disclose whether the wife helped to care for the husband. The trial court found that the wife would suffer great stress if she left her husband of sixty years to travel to Wyoming. The Wyoming Supreme Court affirmed the trial court's ruling permitting the husband to testify by video conference. The state Supreme Court reversed the trial court's ruling permitting the wife to testify remotely. The wife was not ill. The court, however, held the error to be harmless.

*Issue 4: Was the reliability of Maisa Haddad testimony assured?*

*Answer 4: Yes.*

On appeal, Abdul Sweidan argues that the State did not satisfy the second prong of the *Craig* test because the remote video conferencing did not ensure truthful testimony to the same extent as live testimony. In so arguing, Sweidan merely repeats his previous contention that video testimony inherently reduces the trustworthiness of trial testimony. Sweidan identifies no difficulty in the video or audio transmission or in the ability of the jury and him to observe the demeanor of Maisa Haddad or for Haddad to see Sweidan.

Assuming the trial court allows video conference testimony, this court assesses whether other components of the confrontation clause were left intact, including "oath, cross-examination, and observation of demeanor by the trier of fact" to determine if testimony is reliable. *Maryland v. Craig*, 497 U.S. at 837. These components ensure the reliability of testimony in the absence of physical presence.

Maisa Haddad testified under oath, the defense cross-examined her, and, according to the State, the jury could observe Haddad's demeanor. Abdul Sweidan does not argue to the contrary. The State also highlights that it never asked Haddad to identify Abdul Sweidan. Therefore, we hold the reliability of the evidence was assured.

Despite our ruling, we encourage the trial court or the State, with the court's concurrence, to verify on the record the structure and the mechanics of the video

27

conference presentation. Such details should include the number and location of the video screens in the courtroom, the technology present at the location of the witness, the dimensions of the respective screens, and what sections of the witness's body that the jury can see on the screen. The record should confirm that the jury and the defendant see the witness and the witness's body language, and that they hear the witness. The record should also verify that the witness sees the jury and the defendant. Finally, at the conclusion of the testimony, the trial court or the State should substantiate that no errors in the transmission occurred. We do not hold, however, that any of these suggestions must necessarily be followed to fulfill the strictures of the confrontation clause.

In *United States v. Bordeaux*, 400 F.3d at 555 (8th Cir. 2005), the federal appeals court commented that, before approving of two-way video testimony, the court would wish to know answers to a myriad of logistical questions. Important concerns included the size of the monitor, placement of the monitor, and placement of the cameras.

*Issue 5: Must the trial court enter findings of fact when granting a request for video conference testimony?*

*Answer 5: Because of the lack of a formal assignment of error from Abdul Sweidan and because we find any error to be harmless, we do not resolve the question. Without issuing a ruling, we encourage trial courts to enter findings.*

28

Abdul Sweidan emphasizes that the trial court entered no findings identifying the important state public policy on which the court relied or the need for video conference testimony to support the policy. He impliedly assigns error to the lack of findings. Nevertheless, because of the lack of a formal assignment of error and because of the lack of briefing directly on point, we decline to decide whether findings are essential. RAP 10.3(a)(4); *Valente v. Bailey*, 74 Wn.2d 857, 858, 447 P.2d 589 (1968).

In the context of child abuse victims, the United States Supreme Court, in *Maryland v. Craig*, 497 U.S. 836 (1990), has required specific findings to demonstrate necessity. The findings must include (1) remote testimony being necessary to protect the child, (2) the presence of the defendant traumatizing the witness, and (3) the emotional distress suffered by the child witness in the presence of the defendant was more than minimal.

Other courts have followed the United States Supreme Court, in contexts outside child abuse cases, in directing lower courts to enter findings as to an identified important public policy and the need for video conference testimony to advance the policy. In *Commonwealth v. Atkinson*, 987 A.2d at 748 (2009), the Pennsylvania high court held that the trial court breached the accused's confrontation rights, when conducting a motion to suppress, because the trial court failed to enter case specific findings when permitting

video testimony during the motion hearing.  The court also failed to conduct an

evidentiary hearing to determine if video testimony was warranted based on the specific

facts relating to an individual witness.  The court held the constitutional error to be

harmless.  In *State v. Rogerson*, 855 N.W.2d at 499 (Iowa 2014), the court wrote that the

trial court must enter a fact specific finding of the necessity to substitute video for live

testimony.

In a prosecution for obtaining property by false pretenses, the court allowed a

witness to testify by two-way, closed circuit internet broadcast from Nebraska to North

Carolina.  *State v. Seelig*, 226 N.C. App. 147, 738 S.E.2d 427 (2013).  The State alleged

that Paul Seelig falsely advertised his bread as gluten free.  The witness testified to tests

he performed on samples of Seelig's bread products.  The court indicated that, to decide

the necessity question, the trial court must hold an evidentiary hearing and make case

specific findings as to the necessity of allowing the witness to testify outside the

defendant's physical presence in order to fulfill the important state interest.  The trial

court conducted a hearing, after which the court found that the witness had a history of

panic attacks, had suffered a severe panic attack on the day he planned to fly from

Nebraska to North Carolina for trial, was hospitalized as a result, and was unable to travel

to North Carolina because of his medical condition. The record showed that the defendant and the jury could see the witness while he testified.

In *People v. Buie*, 285 Mich. App. 401, 775 N.W.2d 817 (2009), the reviewing court remanded to the trial court for a specific finding because the record was devoid of any evidence or any findings by the trial court regarding the necessity of the video conferencing procedure implemented. In *Horn v. Quarterman*, 508 F.3d 306 (5th Cir. 2007), the Fifth Circuit Court of Appeals on habeas review held the lower court properly permitted remote testimony based on the court's case specific finding of necessity. The reviewing court looked to the record and found the trial court took efforts to confirm the illness of a witness and his inability to travel and concluded in its findings that extreme circumstances made it necessary for the witness to give his testimony remotely. The trial court's findings also included a specific overview of the procedural safeguards implemented to ensure the other components of his Sixth Amendment right remained intact.

One court strongly suggested that the trial court conduct an evidentiary hearing before deciding whether to permit video conference testimony. The federal appeals court in *United States v. Yates*, 438 F.3d at 1315 (11th Cir. 2006) stated that generally the trial court must hold an evidentiary hearing to determine whether it is essential in the

particular case to deny a defendant his constitutional rights in order to further a compelling state interest. The court reversed convictions because the district court failed to make "case-specific findings of fact that would support a conclusion that this case is different from any other criminal prosecution in which the Government would find it convenient to present testimony by two-way video conference." *United States v. Yates*, 438 F.3d at 1316.

We note that neither the physician nor Maisa Haddad signed their respective letters or otherwise provided testimony under oath or penalty of perjury. We encourage trial courts to require affidavits or even testimony on the phone under oath before ruling on the necessity to further an important public policy.

The remainder of this opinion has no precedential value. Therefore, it will be filed for public record in accordance with RCW 2.06.040, the rules governing unpublished opinions.

FACTS REDUX

Dania Alhafeth and Abdul Sweidan, originally from Homs, Syria, married in 1996. In 2012, the couple fled the Armageddon in Syria and moved to Jordan. In May 2016, Sweidan and Alhafeth moved to the United States as refugees with four of their children. Married daughter, Marisha, remained in Jordan. The couple and their four children

32

resided in a Kennewick apartment. We give the pseudonyms of Amal to their teenage daughter and Kashif to their youngest child, a boy. Amal was seventeen years old on August 30, 2017. Kashif was two years old on that date.

During trial, Dania Alhafeth and Amal described the marital relationship between Alhafeth and Abdul Sweidan as permeated with quarrels about finances and Alhafeth's socializing. Some arguments ended with Sweidan pushing or punching Alhafeth. Alhafeth sometimes struck back. The disputations occurred daily once the family arrived in the United States. If divorce ever entered the conversation, Sweidan threatened that he would rather kill Alhafeth than divorce her.

During trial, Abdul Sweidan disagreed with his wife's and his daughter's characterization of the marriage. Sweidan testified that he and Dania Alhafeth maintained a good relationship. Sweidan conceded the couple faced marital problems in Jordan when he discovered Alhafeth's relationship with another man. According to Sweidan, when he threatened to expose the relationship, she threatened to kill herself. Sweidan told Alhafeth not to kill herself because of the children, and he forgave her dalliance for the children's benefit.

Abdul Sweidan acknowledged that two and a half months before August 30, 2017, he and his wife quarreled. Dania Alhafeth screamed at Sweidan, so he spat on Alhafeth.

She scratched him in return. Sweidan denied ever striking Alhafeth. As a result of the scratching, Sweidan retorted to Alhafeth: "you are cursed in this life and the hereafter." RP (April 13, 2018) at 1245-46.

A month before August 30, 2017, Amal confronted her father and suggested that he and her mother separate. Abdul Sweidan responded with agitation and by approaching close to Amal as if to strike her.

On August 29, 2017, the day preceding the stabbing, Dania Alhafeth took her three youngest children to a ubiquitous McDonald's, where Amal worked. Alhafeth and the children planned to eat at the restaurant and give Amal a ride home after her shift. Unbeknownst to Alhafeth, Abdul Sweidan followed her to the restaurant. After Sweidan entered the restaurant, he grasped Alhafeth's hand and directed her to sit. Alhafeth told Sweidan not to grab her hand. Alhafeth warned that the restaurant camera would capture his behavior and a restaurant employee would phone the police. Sweidan responded that he did not care. Alhafeth sat and the two conversed. Sweidan wanted to make peace. Alhafeth remarked:

> [W]hat we make peace about? We always fight and we always have the quarrels. And then we make the issue short, brief, and we close the subject.

RP (April 11, 2018) at 1133.

34

According to Abdul Sweidan, he and Dania Alhafeth quarreled the night of August 29 about Alhafeth's side job of cooking for other families. Alhafeth sent all income from the cooking to her mother in Syria for use in anti-government operations. On that same day, he learned that Alhafeth had renewed contact with a romantic interest in Jordan.

We present the conflicting accounts of Abdul Sweidan and Dania Alhafeth as to the events on August 30, 2017. Alhafeth testified that Sweidan surprised her by returning home in the afternoon early from work. Alhafeth and her two-year-old son, Kashif, reposed in the living room. Sweidan commented that the Tyson plant, where he worked, had exhausted its meat supply. Sweidan queried Alhafeth: "are we going to make up?" RP (April 11, 2018) at 1140. Alhafeth responded that she foresaw no benefit of reconciling because they constantly disagreed. Sweidan entered the kitchen, where Alhafeth assumed he intended to prepare food. Sweidan returned to the living room with a knife and repeatedly stabbed Alhafeth. Sweidan exclaimed: "'[d]ie, die.'" "'May God not bring you back.'" RP (April 11, 2018) at 1140-42.

Dania Alhafeth testified that Kashif sat with her when Abdul Sweidan initiated the stabbing. Kashif yelled, "Momma, Momma," and attempted to push his father. RP (April 11, 2018) at 1142. Sweidan took the toddler to a back bedroom and locked him inside the room. Kashif suffered no physical injuries.

According to Dania Alhafeth, Abdul Sweidan returned to the living room, changed clothes, and stuffed his disrobed clothes into a bag. Sweidan noticed that Alhafeth still breathed. Sweidan questioned: "'you haven't died yet?'" RP (April 11, 2018) at 1144. Sweidan then stabbed Alhafeth in the thigh. Sweidan left the apartment and locked the door.

Dania Alhafeth testified that, as she heard Kashif crying and kicking the door, she located her phone. She called a neighbor, who called 911. When police arrived, Alhafeth alerted them to the locked bedroom holding her son. RP 682.

Abdul Sweidan recounted different facts that transpired on August 30, 2017. Sweidan testified that, on August 30, he returned from work early because of a dental appointment. He wanted to bathe and nap before the appointment. On his arrival home, Dania Alhafeth confronted Sweidan and called him a traitor. Sweidan assumed Alhafeth found a story he wrote and hid about a Jewish man he met in Jordan who thought Sweidan was of Jewish descent. The Jewish man gave Sweidan a gold chain, star, and card with an Israeli flag thereon, which Sweidan kept. Alhafeth threatened to tell others that Sweidan was Jewish and a traitor. Sweidan retorted that he would inform Alhafeth's family about her illicit relationship. During this argument, Kashif wandered out of his bedroom, and Alhafeth returned him to the bedroom and locked the door.

36

Abdul Sweidan, bored by Dania Alhafeth's behavior, went to the bathroom to brush his teeth. Alhafeth called him into the kitchen and surprised him by displaying a large knife. Sweidan tried to snatch the knife from Alhafeth, but she slashed his fingers. She then stabbed her chest and neck. Sweidan asked Alhafeth why she insisted on hurting herself, and she replied that she wanted Sweidan to go to jail for a long time.

According to Abdul Sweidan, after Dania Alhafeth inflicted cuts on his fingers and wounds to herself, he searched several rooms for items given him by the Jewish man in Jordan. He feared for his safety if Alhafeth's family learned he harbored pro-Israel sentiments. While searching, he left blood from his fingers. He donned rubber gloves from the kitchen to control the bleeding from his fingers. The gloves did not stem the bleeding, so he threw them on the ground. Sweidan noticed blood splotches on the pajama pants he wore, so he removed the pants.

Abdul Sweidan testified that he returned to Dania Alhafeth and saw her lying on the living room floor. He left the apartment and once outside remembered the locked bedroom held Kashif. He attempted to reenter the residence, but Alhafeth had positioned herself at the door, and she engaged the lock every time he tried to unlock the door. Sweidan told Alhafeth that he wanted to take Kashif and her to the hospital, but she refused to open the door.

Abdul Sweidan drove himself to Trios Hospital in Kennewick and arrived at 1:37 p.m. Medical staff first assisted him at 1:49 p.m. He sustained large lacerations on his right hand. Abdul Sweidan spoke primarily Arabic. During the course of his treatment, Trios Hospital called an Arabic interpreter, who assisted Sweidan in communicating with staff. During the treatment, Sweidan told the treating physician the injuries occurred while cutting meat.

Law enforcement officers arrived at Dania Alhafeth's home at 1:42 p.m., and they ferried Alhafeth to Trios Hospital. At the emergency room, Dr. Brandon Thomas observed Alhafeth with two stab wounds on her face, multiple wounds on the right side of her back, wounds on the anterior and posterior abdomen, wounds on her left side flank, and wounds in her upper groin. Dr. Thomas classified Alhafeth's condition as critical. Thomas concluded that Alhafeth could not have inflicted the wounds to her back. Thomas also noted she had defensive wounds between her thumb and second finger. Dania Alhafeth's principal language is also Arabic. Trios Hospital employed an Arabic interpreter by phone also to communicate with Alhafeth.

Nurse Debbie Logan noticed the use of two Arabic interpreter lines in the emergency room, one for use by a male patient and the other for use by a female patient. Amateur detective Logan pondered the implications of an Arabic-speaking woman,

38

suffering from stab wounds, being present in the same emergency room as an Arabic-speaking man, with large cuts on his hand. Logan deemed Abdul Sweidan's changing of clothes unusual for one who suffered injuries. Logan also saw a large amount of blood spatter on his feet. She alerted the police, who approached Abdul Sweidan.

During a search of the couple's apartment, law enforcement seized Abdul Sweidan's shirt, Kashif's shirt, knives from the kitchen sink, and rubber gloves from under the sink. Law enforcement spotted blood throughout the apartment and took swabs from various locations.

Swab testing confirmed the presence of Dania Alhafeth's blood on Abdul Sweidan's shirt, with the odds of a random match at 1 in 10 nonillion. The knives tested positive for blood, but tests could not discern if the blood was human blood. The rubber gloves had damp blood. The blood on the gloves matched Abdul Sweidan's DNA, as the major contributor, with the odds of a random match at 1 in 2.1 nonillion. Blood found on Abdul Sweidan's right calf matched the DNA of Dania Alhafeth as a major contributor with the odds of a random match at 1 in 10 nonillion.

Kashif's shirt contained blood on the bottom matching Abdul Sweidan's DNA as a 1 in 2.1 nonillion odds of a random match. The blood on the hood of Kashif's shirt

contained a mixture of blood, making it 2.4 undecillion times more likely to be a mixture of Sweidan's and Dania Alhafeth's DNA than that of a random person's.

Other testing revealed blood on the apartment's entryway floor, entryway wall, doorway, a coffee table, a brown couch, pillows on the couch, a telephone, a television stand, the bathtub, and the kitchen floor and counter. Bloodstains in the living room indicated that an injured party bled while lying on the living room floor. The master bedroom and bathroom also contained blood. The bathroom contained blood on a light switch and on toilet paper, such that it dripped on the wall and the floor. Blood on the light switch included a single source, matching Abdul Sweidan with the odds of a random match at 1 in 2.1 nonillion.

Law enforcement officers also took blood swabs from inside Abdul Sweidan's car. Testing of the samples revealed blood on the exterior driver door, a white plastic bag, a purple towel in the passenger side of the center control panel, and a cigarette box.

PROCEDURE REDUX

In addition to charging Abdul Sweidan with second degree murder and first degree assault, the State of Washington sought an exceptional sentence because Sweidan

committed the crimes in front of his minor son, Kashif.  The State also charged Sweidan

with committing the crimes with a deadly weapon other than a firearm.

During trial, Abdul Sweidan's daughter, Amal, testified.  The prosecution asked

her about a statement given to a detective on August 30, 2017.

> Q. And without saying anything that you heard or what anybody else
> said, do you remember what you told that detective?
> A. I said that—well, I don't know exactly because it just depended
> on what questions he asked, so just depended on what questions were asked.
>  I remember that I said that my family, they were having an argument or
> arguments, and I said that I think that, *I think that was him who did that, I
> mean my dad*.

RP (April 4, 2018) at 632 (emphasis added).

In addition to convicting Abdul Sweidan of attempted second degree murder and

first degree assault, the jury also ruled Sweidan to have engaged in an aggravated

domestic violence offense.  The court later dismissed the first degree assault charge based

on the prohibition on double jeopardy.

At sentencing, Abdul Sweidan requested a sentence of no more than 189 months.

The State sought an additional 147 month sentence, beyond a 189 month standard range

sentence, because the stabbing occurred within sight and hearing of the couple's child.

Sweidan responded that, considering Kashif's age at the time of the incident, he likely

would have no memory of the event.  The trial court imposed a sentence of 336 months,

41

which represented a standard range of 189 months plus 147 months for the sentencing enhancement.

The sentencing court entered eighteen findings of fact and one conclusion of law. The findings of fact included:

> 4. The facts presented at trial included evidence that the defendant came home early from work. His wife, Dania Alhafeth, was present with their two-year-old child. The defendant and Ms. Alhafeth had a brief conversation and the defendant grabbed a knife from the kitchen and began stabbing Ms. Alhafeth numerous times.
> 5. At trial Ms. Alhafeth testified that the defendant, while stabbing her, said, "Die, Die and may God never bring you back."
> . . . .
> 12. The Court considered what punishment is proportionate to the criminal acts and the criminal history of the defendant for purposes of sentencing within the standard range. The Court also considered the seriousness level of the crime and the testimony of the victim.
> 13. The Court considered the testimony of the victim and the impact to her and her family based on the horrific and brutal attack.
> 14. The Court considered the number of stab wounds upon the victim, 23 to 30, and found this demonstrates the level of violence initiated during the attack by the defendant.
> 15. The Court found that there were no mitigating factors the defendant presented. The Court also found the defendant did not show remorse or take any responsibility for the attack.
> 16. The Court considered the facts presented at trial detailing the act being committed within the sight and sound of the young child and the impact it would make on this child for purposes of sentencing the defendant outside of the standard range. The Court considered the amount of trauma the child witnessed at such a young age[,] which the Court found may have long lasting effects. The Court finds that based on the conduct being within the sight and sound of the child that a standard range sentence is not sufficient punishment and not in the best interest of justice.

CP at 152-53.  The sole conclusion of law states:

> Based on the above findings of fact, the jury's finding of guilt on Attempted Murder in the Second Degree with a Domestic Violence Allegation, an Aggravated Circumstance Allegation of Aggravated Domestic Violence, a Deadly Weapon Enhancement, the evidence presented at the hearing, and testimony at trial, the Court concludes that there are substantial and compelling reasons justifying an exceptional sentence of 147 months for a total of 336 months.

CP at 153-54.

The State of Washington sought a fifty-year ban on all contact between Abdul Sweidan, on the one hand, and Dania Alhafeth and the four children living in the United States, on the other hand.  The State claimed that all children likely witnessed ongoing domestic violence meted by Sweidan and that contact with him would cause emotional distress.  Abdul Sweidan objected to the length of the proposed no contact order on constitutional and other grounds.  The court entered a no-contact order prohibiting Sweidan from initiating contact with the children until 2046, the date on which the State would likely release Sweidan from prison.  According to the sentencing court, the minor child being subjected to a violent and brutal act warranted the children's protection.

The sentencing court ordered Abdul Sweidan to pay $900 in legal financial obligations including a $200 criminal filing fee and a $100 domestic violence penalty assessment.

*Issue 6: Was any constitutional error harmless?*

*Answer 6: Yes.*

The State argues that any violation of Abdul Sweidan's confrontation clause rights was harmless. We agree.

A violation of the confrontation clause is subject to harmless error analysis. *Lilly v. Virginia*, 527 U.S. 116, 139-40, 119 S. Ct. 1887, 144 L. Ed. 2d 117 (1999); *State v. Lui*, 179 Wn.2d 457, 495, 315 P.3d 493 (2014). If harmless error, a violation of a defendant's rights under the confrontation clause does not require reversal. *State v. Moses*, 129 Wn. App. 718, 732, 119 P.3d 906 (2005).

Appellate courts generally assess harmless constitutional error in the context of the trial court admitting impermissible evidence. In such a context, the reviewing court naturally assesses whether the jury would have convicted absent such evidence. In our appeal, Abdul Sweidan challenges the method of presentation of the testimony, not the content of the testimony. If the trial court had required Maisa Haddad to testify in person and Haddad had appeared in Benton County, Washington, her testimony could have been more damning to Sweidan since the jury saw Haddad in person. Thus, Sweidan may have benefitted by any constitutional violation. Still, by drawing such a conclusion, we would speculate as to whether Maisa Haddad would have come to Washington State and

whether her face-to-face testimony would have caused greater harm to Sweidan. Also, all rulings permitting video testimony could escape review. No reported decision adjudges harmless error, in the context of wrongly admitted video conference testimony, based on the impact of the testimony if presented live. Instead, decisions assess harmless error under the traditional rule whereby the court measures the weight of the testimony absent the video testimony.

A violation of a defendant's rights under the confrontation clause constitutes harmless error if the State proves beyond a reasonable doubt that the jury verdict did not rely on the error. *State v. Lui*, 179 Wn.2d at 495 (2014). An error is prejudicial unless the untainted evidence is so overwhelming it necessarily leads to a finding of guilt. *State v. Koslowski*, 166 Wn.2d 409, 431, 209 P.3d 479 (2009). To determine whether a violation is harmless, this court reviews, the importance of the witness's testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and the overall strength of the prosecution's case. *Delaware v. Van Arsdall*, 475 U.S. 673, 686-87, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986); *State v. Saunders*, 132 Wn. App. 592, 604, 132 P.3d 743 (2006).

An assessment of harmlessness cannot include consideration of whether the witness's testimony would have been unchanged had there been confrontation. *Coy v. Iowa*, 487 U.S. at 1021-22 (1988). Such an inquiry would involve pure speculation, and harmlessness must therefore be determined by reviewing the remaining evidence. *Coy v. Iowa*, 487 U.S. at 1021-22.

Abdul Sweidan argues that admission of Maisa Haddad's testimony was harmful as some of her testimony was not cumulative of other testimony. Sweidan also emphasizes that, during closing, the State relied on testimony of Haddad to corroborate testimony from Dania Alhafeth.

Maisa Haddad testified that Abdul Sweidan told his attending doctor that he cut his hand while at work. This testimony conflicted with Sweidan's testimony that he cut his hand when taking the knife away from Dania Alhafeth. Haddad also testified that the defendant cursed his wife while at the hospital, stating, "may God not bless her." RP (April 5, 2018) at 767. In closing argument, the State mentioned Haddad's testimony that Sweidan cursed his wife, while alluding to the similarity between the cursing in the hearing of Haddad and the cursing directly at Alhafeth.

In the absence of Maisa Haddad's testimony, the State presented overwhelming evidence to demonstrate Abdul Sweidan's guilt. Dania Alhafeth testified that Sweidan

repeatedly stabbed her with a kitchen knife in the attack. Her attending physician, Dr. Brandon Thomas, testified she sustained twenty-three stab wounds including on her back. Sweidan averred that Alhafeth cut herself. He did not contend some third party attacked his wife. The most harmful testimony came from Dr. Thomas, who opined that Alhafeth could not have inflicted the wounds on her back by herself.

Maisa Haddad's testimony, that Abdul Sweidan told his attending doctor that he cut his hand while at work, conflicted with Sweidan's testimony that he cut his hand when taking the knife away from Dania Alhafeth. Nevertheless, Sweidan never denied telling the doctor that he cut his hand while at work.

The couple's residence contained blood throughout. The blood on gloves in the residence included a DNA match with Abdul Sweidan's with odds of a random match at 1 in 2.1 nonillion. Sweidan explained the blood by his testimony that his wife cut him. Nevertheless, Sweidan's and Alhafeth's blood on Kashif's clothing contradicted Sweidan's testimony that he earlier locked Kashif in his room.

Maisa Haddad's testimony that Abdul Sweidan cursed Dania Alhafeth was consistent with Sweidan's own testimony that he earlier cursed Alhafeth for her conduct. Two months earlier, when Alhafeth scratched him, he told Alhafeth: "you are cursed in this life and the hereafter." RP (April 12, 2018) at 1246.

Amal Testimony

*Issue 7: May Abdul Sweidan assign error to the testimony from his daughter that she believed her father harmed her mother, when Sweidan did not challenge the testimony in the trial court?*

*Answer 7: We decline to answer this question, and we review the merits anyway since the assignment of error may involve manifest constitutional error.*

For the first time on appeal, Abdul Sweidan contends that his daughter Amal's testimony, that she believed Sweidan harmed her mother, constituted error. The State asks that we decline review of the assignment of error because Sweidan did not object to the testimony during trial.

A party may not generally raise a new argument on appeal that the party did not present to the trial court. *In re Detention of Ambers*, 160 Wn.2d 543, 557 n.6, 158 P.3d 1144 (2007). A party must inform the trial court of the rules of law it wishes the court to apply and afford the trial court an opportunity to correct any error. *Smith v. Shannon*, 100 Wn.2d 26, 37, 666 P.2d 351 (1983).

RAP 2.5(a) embodies the principle that an appellant may not raise a new argument on appeal, but the rule contains a number of exceptions. RAP 2.5(a)(3) allows an appellant to raise for the first time "manifest error affecting a constitutional right," an

exception on which a criminal appellant commonly relies. The law treats constitutional errors especially under RAP 2.5(a) because the errors often result in serious injustice to the accused and may adversely affect public perceptions of the fairness and integrity of judicial proceedings. *State v. Scott*, 110 Wn.2d 682, 686-87, 757 P.2d 492 (1988).

Washington courts and even decisions internally have announced differing formulations for "manifest error." First, a manifest error is one "truly of constitutional magnitude." *State v. Scott*, 110 Wn.2d at 688. Second, perhaps perverting the term "manifest," some decisions emphasize prejudice, not obviousness. The defendant must identify a constitutional error and show how, in the context of the trial, the alleged error actually affected the defendant's rights. The showing of actual prejudice renders the error "manifest," allowing appellate review. *State v. O'Hara*, 167 Wn.2d 91, 99, 217 P.3d 756 (2009); *State v. Scott*, 110 Wn.2d at 688. A third formulation requires that the facts necessary to adjudicate the claimed error be in the record on appeal. *State v. McFarland*, 127 Wn.2d 322, 333, 899 P.2d 1251 (1995).

Sometimes the reviewing court does not decide whether the appeal challenge qualifies as manifest constitutional error until after reviewing the underlying arguments. In this circumstance, the court proceeds to preview the merits of the constitutional argument to determine if the challenge will likely succeed. *State v. Reeder*, 181 Wn. App.

897, 912, 330 P.3d 786 (2014), *aff'd*, 184 Wn.2d 805, 365 P.3d 1243 (2015). In doing so,

the court will also address the merits of the claim and determine whether, in the context

of the entire record, the error is harmless beyond a reasonable doubt. *State v. O'Hara,*

167 Wn.2d at 99; *State v. Grimes*, 165 Wn. App. 172, 187, 267 P.3d 454 (2011). We do

so here.

*Issue 8: Did Amal's testimony violate Abdul Sweidan's right to a fair trial?*

*Answer 8: No.*

Abdul Sweidan argues that under ER 701, Amal's testimony violated his right to a

fair trial. Sweidan contests the portion of Amal's testimony when she replied to a

question from the prosecution regarding her statements to a detective:

> Q. And without saying anything that you heard or what anybody else
> said, do you remember what you told that detective?
> A. I said that—well, I don't know exactly because it just depended
> on what questions he asked, so just depended on what questions were asked.
> I remember that I said that my family, they were having an argument or
> arguments, and I said that I think that, I think that was him who did that, I
> mean my dad.

RP (April 4, 2018) at 632. We note that the question posed by the State's attorney was

proper, but that Amal's answer went beyond the scope of the question. The question only

asked for a yes or no answer and instructed Amal not to disclose what she said to the

detective. Although possibly not important, Amal did not directly testify that, as of the

date of the trial, she deemed her father guilty. Instead, she testified that she earlier told a

law enforcement officer that she believed her father assaulted her mother.

ER 701 permits testimony by a lay witness only when the testimony is: (1)

rationally based on the perception of the witness, (2) helpful to the jury, and (3) not based

on scientific or specialized knowledge. A witness may not give his or her opinion as to

the guilt of a defendant either by direct statement or inference. *State v. Black*, 109 Wn.2d

336, 348, 745 P.2d 12 (1987).

Abdul Sweidan relies on *State v. Johnson*, 152 Wn. App. 924, 219 P.3d 958 (2009)

to argue that Amal's statements constituted manifest constitutional error. In *State v.*

*Johnson*, the State charged Gerald Johnson with second degree child molestation. The

court permitted three witnesses to testify to out-of-court statements made by Johnson's

wife. The complainant, her mother, and her stepfather all related an incident when

Johnson's wife confronted the complainant about the accusations against her husband and

demanded that she prove she had a sexual relationship with Johnson. In response, the

complainant mentioned a mole on Johnson's penis and his specific sexual habits. All

three witnesses testified that Johnson's wife acknowledged that the accusations must be

true. This court held that the testimony from the witnesses constituted manifest

constitutional error and reversed the trial court's admission of the evidence. This court characterized the testimony as collateral testimony offered solely to prejudice the jury.

In light of *State v. Johnson*, Abdul Sweidan argues that Amal's testimony served no purpose but to prejudice the jury against him since Amal vouched for Dania Alhafeth's version of events. According to Sweidan, Amal's testimony shed no light on the evidence and only expressed her belief as to his guilt. Sweidan worries that his daughter's opinion that her father harmed her mother would carry great weight with jurors.

We distinguish *State v. Johnson*. In Abdul Sweidan's trial, the State did not ask Amal to express any opinion on Sweidan's guilt. The State did not call multiple witnesses to testify as to a collateral matter, and Amal's comment was fleeting. The State did not mention Amal's comment during closing.

In *State v. Mohamed*, 187 Wn. App. 630, 350 P.3d 671 (2015), this court distinguished between a fleeting comment, which causes no prejudice, and the prosecutor directly asking a witness about the credibility of another witness and when a witness's answer focuses on a credibility assessment. *State v. Mohamed*, 187 Wn. App. at 651. Unlike in *Mohamed*, Amal's testimony went directly to the guilt of Abdul Sweidan, but the State did not solicit the testimony and the comment was fleeting.

For an error to constitute manifest constitutional error, the error must have

"practical and identifiable consequences." *State v. Montgomery*, 163 Wn.2d 577, 595,

183 P.3d 267 (2008). Because of the transitory nature of Amal's comment and

overwhelming evidence of guilt, the remark lacked identifiable consequences.

Exceptional Sentence

*Issue 9: Whether the trial court erred in imposing an exceptional sentence based*

*on factors not found by the jury?*

*Answer 9: No.*

The sentencing court imposed an exceptional sentence on Abdul Sweidan because

he attempted to murder his wife in the presence of the couple's young son, Kashif. On

appeal, Sweidan contends the trial court erred in imposing the exceptional sentence

because the court relied on evidence irrelevant to the aggravating circumstance. Sweidan

observes that the sentencing court's findings of fact 4, 5, 12, 13, 14, and 15, entered in

support of the exceptional sentence, did not mention Kashif. The State responds that no

improper reliance on additional factors occurred. Instead, according to the State, the

court's findings of fact established the reasoning for both the exceptional sentence and

the evidence for the verdict.

Under the Sentencing Reform Act of 1981 (SRA), chapter 9.94A.535 RCW, a sentencing court may impose an exceptional sentence based on "substantial and compelling reasons justifying an exceptional sentence." The court must "set forth the reasons for its decision in written findings of fact and conclusions of law." RCW 9.94A.535. A jury must enter findings supporting the imposition of an exceptional sentence, and the trial court must then determine "whether the facts found by the jury are substantial and compelling reasons." *State v. Perry*, 6 Wn. App. 2d 544, 557, 431 P.3d 543 (2018).

Abdul Sweidan's jury found the aggravating circumstance of the crime being committed within a minor child's sight and sound. RCW 9.94A.535(3)(h)(ii). The statute declares:

> (3) Aggravating Circumstances—Considered by a Jury—Imposed by the Court
> Except for circumstances listed in subsection (2) of this section, the following circumstances are an exclusive list of factors that can support a sentence above the standard range. Such facts should be determined by procedures specified in RCW 9.94A.537.
> . . . .
> (h) The current offense involved domestic violence, as defined in RCW 10.99.020, or stalking, as defined in RCW 9A.46.110, and one or more of the following was present:
> . . . .
> (ii) The offense occurred within sight or sound of the victim's or the offender's minor children under the age of eighteen years.

Based on the jury's finding, the sentencing court held authority to impose an exceptional sentence based on that specific circumstance.

When reviewing the propriety of an exceptional sentence, we ask: (a) whether the reasons given by the sentencing judge are supported by the evidence for which the standard of review is clearly erroneous; (b) whether the reasons justify a sentence outside the standard range under a de novo review; and (c) whether the sentence is too excessive, under an abuse of discretion review. *State v. Kolesnik*, 146 Wn. App. 790, 802-03, 192 P.3d 937 (2008). Abdul Sweidan asks this court to review whether the reasons given justify the imposition of a sentence outside the standard range under a de novo review.

Abdul Sweidan relies on *State v. Perry*, 6 Wn. App. 2d 544 (2018). In *State v. Perry*, the jury found injuries substantially exceeded the level of bodily harm necessary to constitute bodily harm as defined by the instructions. *State v. Perry*, 6 Wn. App. 2d at 556. The trial court made additional findings that included:

> 3. The victim in this case, Ryan Moore, may very likely have died had his brother not been walking along the road with him, which is a substantial and compelling reason to impose an exceptional sentence.
> . . . .
> 5. The failure to stop and render aid in this case does not have any excuse in the view of the jury and in the view of this Court, which is a substantial and compelling reason to impose an exceptional sentence.
> 6. The unwillingness to stop and see if anybody had in fact been hurt gives rise to two very unflattering implications . . . [t]hese are substantial and compelling reasons to impose an exceptional sentence.

55

*State v. Perry*, 6 Wn. App. 2d at 550.  In *Perry*, this court reasoned that the above findings made by the trial court went beyond those facts submitted to the jury.  This court reversed the trial court's sentence because it was not satisfied that the trial court would have imposed the same sentence based on the jury findings alone.

Abdul Sweidan's sentencing court may have entered some findings of fact beyond those found by the jury.  Nevertheless, the court relied on the jury's determination that the the stabbing occurred within the sight and sound of the young child.  Findings of fact 4 and 16 specifically mentioned the crime being committed in the presence of Kashif.  The other findings may be superfluous, but no rule prohibits the sentencing court from entering unneeded findings, as long as one or more of the findings justified the exceptional sentence.  The findings echoed the finding by the jury.

We do not face the same issue faced by the *Perry* court, when the court could not determine whether the trial court based its legal conclusion to impose the exceptional sentence solely on the jury's finding or on additional facts unrelated to the finding.  Sweidan's sentencing court's findings of fact demonstrated that the trial court imposed an exceptional sentence based on the jury's finding of the aggravating factor.

*Issue 10: Did the trial court err in entering a 28-year total ban on contact with four of Sweidan's children?*

*Answer 10: Maybe. We remand for further consideration.*

Abdul Sweidan next argues, as he did during sentencing, that the sentencing court's imposition of a 28-year no-contact order with his four children violates his fundamental right to parent. Sweidan contends that the trial court determined the length of the no-contact order simply by matching it to the length of his sentence. Sweidan also argues the trial court failed to consider alternative restrictions such as allowing Sweidan's children to initiate contact. The State contends that the no-contact order upholds the State's interest to protect children from witnessing domestic violence and to protect their physical and mental health.

Parents have a fundamental constitutional liberty interest in the "care, custody, and management" of their children. *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). This court must carefully review conditions that interfere with the right to the care, custody, and companionship of one's children. *In re Personal Restraint of Rainey*, 168 Wn.2d 367, 374, 229 P.3d 686 (2010). These conditions must be "'sensitively imposed'" and must be "'reasonably necessary to accomplish the essential needs of the State and public order.'" *In re Personal Restraint of Rainey*, 168 Wn.2d at 374 (quoting *State v. Warren*, 165 Wn.2d 17, 32, 195 P.3d 940 (2008)). Washington case law requires the trial court to articulate the reasons for the reasonable necessity for a no-

contact order or the record must demonstrate the necessity. *State v. Howard*, 182 Wn.

App. 91, 101, 328 P.3d 969 (2014). This court reviews sentencing conditions for an

abuse of discretion. *In re Personal Restraint of Rainey*, 168 Wn.2d at 374. In reviewing

a no-contact order, this court should review its scope and length of duration. *State v.

Howard*, 182 Wn. App. at 101.

Washington law does not permit blanket prohibitions of contact between a parent

and his or her children absent a showing that the order is reasonably necessary to serve

the State's interest. "[T]he interplay of sentencing conditions and fundamental rights is

delicate and fact-specific, not lending itself to broad statements and bright line rules." *In

re Personal Restraint of Rainey*, 168 Wn.2d at 377. Our Washington Supreme Court has

gone as far as to state that, even in a case when the child is a victim of the parent,

prohibiting all contact between the child and the defendant parent is inappropriate without

a showing that the no-contact order is necessary for the child's safety. *In re Personal

Restraint of Rainey*, 168 Wn.2d at 378. A trial court should also consider if less

restrictive alternatives, such as indirect contact or supervised visitation, may be

reasonable instead of a full ban on contact.

The State argues that its interest to protect children from witnessing domestic

violence is compelling. *State v. Ancira*, 107 Wn. App. 650, 654, 27 P.3d 1246 (2001).

The State also has the responsibility to protect a child when parental actions or decisions seriously conflict with the physical or mental health of the child. *In re Welfare of Sumey*, 94 Wn.2d 757, 762, 621 P.2d 108 (1980). Finally, the State argues that the Department of Corrections has a policy to restrict or deny contact between an offender and those of the same class that he or she has victimized.

In *State v. Aguilar*, 176 Wn. App. 264, 308 P.3d 778 (2013), this court upheld a ten-year no-contact order between Sebastian Cortes Aguilar and his thirteen-year-old daughter and younger son. In that case, Aguilar's daughter witnessed Aguilar stab his wife at least five times and kill her. During the event, the daughter witnessed Aguilar beating her mother. The daughter attempted to remove her mother from the scene, and Aguilar followed them and stabbed his wife. Sebastian Cortes Aguilar claimed a cut his daughter sustained during the incident was an accident. The jury also convicted Aguilar of second degree assault of his daughter during the incident. The son witnessed the argument and called 911 during which he heard his mother screaming.

At sentencing, the trial court observed that Sebastian Cortes Aguilar failed to take responsibility for the killing and blamed his wife for the incident. Further, the children were victims of his crime even though they were not the specific targets. This court held that the trial court did not abuse its discretion by imposing a ten-year no-contact order and

that the trial court correctly found the no-contact order reasonably necessary to protect the emotional well-being of the two children. The ten-year length of the no-contact order allowed Cortes to regain contact with his children when the children are at a more mature age and can address their relationship with their father in light of the event that occurred.

*State v. Aguilar* echoes Abdul Sweidan's appeal in that Kashif witnessed the brutal assault and Amal testified against her father. Further, Abdul Sweidan blames his wife for the incident.

Abdul Sweidan's sentencing court considered the best interests of the children, but the court did not address whether the no-contact order would continue to further the State's interest in protecting the children for twenty-eight years. The trial court failed to consider that the State's interests may change over time. At the conclusion of the twenty-eight years, the children will be 47, 45, 39 and 30 respectively. The children may wish to see their father sooner and no harm may come to them by sooner visitation. Although Abdul Sweidan may be in prison, prison rules might allow some visitation.

We remand and ask the trial court to reconsider the duration of its order and what is reasonably necessary to protect the children. This court outlined instructions, in *State v. Torres*, 198 Wn. App. 685, 393 P.3d 894 (2017), for imposing the scope and duration

of the no-contact order. As stated in *Torres*, the trial court should consider whether a juvenile or family court would be a better place to resolve the issue.

## Criminal Filing Fee

*Issue 11: Did the trial court err in imposing the $200 criminal filing fee despite the Abdul Sweidan's indigence.*

*Answer 11: No, not at the time, but the law allows a retroactive striking of the fee.*

Abdul Sweidan contends that, under *State v. Ramirez*, 191 Wn.2d 732, 426 P.3d 714 (2018), the 2018 amendments to the criminal filing fee statute require the $200 criminal filing fee ordered by the trial court to be struck. Swedian argues that, under the current version of RCW 36.18.020(2)(h), the $200 filing fee may not be imposed on those defendants who are indigent at the time of sentencing. The sentencing court found Sweidan to be indigent. These amendments apply prospectively to cases pending on appeal, and therefore should apply in this case. *State v. Ramirez*, 191 Wn.2d at 746-50. The State concedes that the trial court should strike the $200 filing fee. As part of the remand, the sentencing court should strike the fee.

*Issue 12: Did the trial court err in imposing the discretionary $100 domestic violence penalty assessment despite the appellant's indigence?*

*Answer 12: No, not at the time, but recent amendments to the law may allow the striking of the assessment.*

Finally, Abdul Sweidan contends that the 2018 amendments to the legal financial obligations statutes also require striking the $100 domestic violence penalty assessment as a discretionary cost. Sweidan emphasizes that RCW 10.99.080(1) states a court "may" impose a domestic violence penalty assessment. The statute declares:

> All superior courts . . . may impose a penalty assessment not to exceed one hundred dollars on any . . . person convicted of a crime involving domestic violence. The assessment shall be in addition to, and shall not supersede, any other penalty, restitution, fines, or costs provided by law.

RCW 10.99.080(1).

Although the State concedes the $100 domestic violence assessment should be struck, this court stated in *State v. Smith*, 9 Wn. App. 2d 122, 442 P.3d 265 (2019) that the domestic violence penalty assessment differs from other discretionary fees. "Unlike the statutes governing filing fees and costs, the domestic violence penalty assessment statute was not amended by the 2018 LFO [legal financial obligations] legislation, and does not prohibit imposition of an assessment against indigent defendants." *State v. Smith*, 9 Wn. App. 2d at 127. The inquiry required of the trial court before imposing the domestic violence penalty assessment is how imposition of an assessment on the

defendant will impact the victim. If the defendant is unable to pay "financial obligations

to the victim, such as restitution or child support" then the trial court may decline to

impose it. *State v. Smith*, 9 Wn. App. 2d at 128. RCW 10.99.080(5) states that "judges

are encouraged to solicit input from the victim or representatives for the victim in

assessing the ability of the convicted offender to pay the penalty, including information

regarding . . . family circumstances, and ongoing restitution."

Abdul Sweidan's sentencing court imposed a $4,924.86 crime victim's

compensation amount. Abdul Sweidan did not challenge that amount. The only

information before this court relevant to the domestic violence penalty assessment is this

amount of restitution.

We remand to the trial court for input from Dania Alhafeth or her representative

regarding family circumstances, and ongoing restitution in accordance with RCW

10.99.080(5) in order to determine whether the imposition of the $100 assessment should

be struck.

Statement of Additional Grounds for Review

In his statement of additional grounds, Abdul Sweidan argues that his wife tried to

stab him and then stabbed herself on discovering that he is Jewish. Sweidan argued this

point before the trial court and his counsel included this narrative in the brief. Therefore, this argument presents no additional grounds for review.

Abdul Sweidan also contends that the interpreter during the trial did not represent his answers correctly and did a bad job interpreting. The record does not support this contention. Rather, the interpreter repeatedly asked witnesses to slow down to permit adequate interpretation, and she alerted the judge to any issues with interpreting devices. We deny this additional ground.

## CONCLUSION

We affirm Abdul Sweidan's conviction for attempted second degree murder. We uphold the exceptional sentence based on a child witnessing the attempted homicide.

We remand the case for resentencing. The sentencing court should reconsider the no-contact order in accordance with this opinion. The court should strike the filing fee and make further inquiries regarding the domestic violence assessment penalty.

_____
Fearing, J.

WE CONCUR:

_____          _____
Siddoway, J.                                              Lawrence-Berrey, J.